214 So.2d 753 (1968)
J. Crockett FARNELL, Appellant,
v.
STATE of Florida, Appellee.
No. 67-91.
District Court of Appeal of Florida. Second District.
September 25, 1968.
Rehearing Denied November 8, 1968.
Harry M. Hobbs, and Sam Bucklew, Tampa, for appellant.
Earl Faircloth, Atty. Gen., Tallahassee, and William D. Roth, Asst. Atty. Gen., Lakeland, for appellee.
PIERCE, Judge.
Appellant J. Crockett Farnell appeals to this Court a judgment of conviction entered against him in a criminal case.
*754 On July 14, 1966, information was filed in the Hillsborough County Criminal Court of Record charging Farnell and one James A. (or Jimmie) Johnson jointly in two counts. The first count charged that, from January 1, 1958, to July 14, 1966,[1] Farnell, as School Superintendent of Hillsborough County, and Johnson, as supervisor for the local School Board, embezzled school board property, such as building materials, lumber, paint, etc.; and in furtherance thereof Farnell procured Johnson to deliver said articles through school employees to premises known as "Camp Oconee" in Hillsborough County, wherein Farnell had an interest; and also procured Johnson to direct school employees "to perform work, labor and services" at the camp on school time. The second count followed the first count except that it charged grand larceny instead of embezzlement.
Farnell filed motion to quash upon the main ground that the performance of "work, labor and services" was not "personal property" that could be embezzled or stolen. The trial Judge upheld this contention and quashed both counts, holding that such "allegations * * * [were] not the subject of either Embezzlement or Larceny".
On October 3, 1966, the State Attorney filed amended information against the defendants, charging them in one count with embezzlement under F.S. § 812.10, F.S.A.,[2] in substantially the same language as the original first count. Motion to quash was denied. A bill of particulars by the State specified that the offense consisted of "a periodic series of * * * conversions" from January 1, 1958 to October 3, 1966.
Trial of the case began on December 13, 1966, against Farnell alone, and ten days later the jury returned its verdict of guilt. Johnson did not testify or otherwise appear, and his absence is not explained by the record. During the trial 16 witnesses testified for the State, 11 for the defense. Testimony and trial proceedings were voluminous, comprising over 2000 pages in 11 volumes of the record. 72 exhibits, some quite bulky, were filed.
The evidence covered a wide scope in time, in places, in personnel involved, and in the nature of the transactions depicted. Admittedly, it painted a sordid picture of school administration and disclosed a reprehensible system of petty pilfering in school supplies, never on a large scale, but over a period of some 10 years. It seemingly was the modus operandi around the local school warehouses, limited only by the law of supply and demand. Charitably it could be termed unsavory; from a standpoint of civic conscience it could only be labelled opprobrious. Whatever was going on or whoever was responsible, it was morally and legally wrong.
*755 Numerous subordinate school employees, such as truck drivers, carpenters and maintenance men, gave testimony to the abstractions. The "stuff" was usually hauled away from the depositories or warehouses on school-owned busses or trucks by school employees. While most was diverted to Camp Oconee, not all of it went there. Some of it was taken to an abandoned, rundown farm house near Odessa, Florida. Also, as might be expected, a sizeable portion found its way into the private possession of the workers themselves, all of whom had been previously given immunity by the prosecution.
And the evidence was not limited to school materials. It embraced the use of school facilities for remodelling of articles such as furniture, lawn mowers, gates and fences; also occasions when school property such as busses and trucks would be used for private purposes, always being first replenished with gasoline taken from the school pumps. One such expedition was the use of a school bus in the transfer of horse feed from Lake City to Camp Oconee. The evidence also covered innumerable instances of non-school work done by school employees.
The wraith-like figure of Jimmie Johnson pervaded the atmosphere of the trial from beginning to end, and while named as a co-defendant he was never actually in the courtroom, either in the witness chair or in the prisoner's dock. But according to the workers it was Johnson who was the human catalyst in the entire enterprise. He alone gave the orders and his subordinate workers meekly followed his instructions, admitting they knew it was wrong when they did it.[3]
There was no testimony that Farnell ever ordered or instigated the materials to be furnished or the work performed, or that the orders came from Farnell through Johnson, or that Farnell was ever present when the orders were given. The trial Court ruled that the evidence of Johnson's instructions to the workers was admissible upon the theory that a conspiracy existed between Farnell and Johnson.
All of which points up the critical situation confronting us in three areas of the evidence: (1) whether there was sufficient independent proof of a conspiracy between Farnell and Johnson as to make admissible the hearsay statements of Johnson; (2) whether evidence of offenses similar to those specified in the amended information was admissible; and (3) whether the evidence as to work done by the school employees was properly admitted. We are impelled to the view that the judgment of conviction must be reversed upon each of the three points mentioned. We will discuss these propositions separately.

(1) Proof of Conspiracy.

Farnell had first been elected Hillsborough County School Superintendent in 1948, taking office in January, 1949, and continuing in such capacity until the instant prosecution. One James A. Greco had been a member of the old Board of Trustees of the Hillsborough County school system from his election in 1949 until the end of 1958, when it was abolished by referendum, and thereafter all school authority was centered in the Board of Public Instruction. The original Board of Trustees, among other duties, had supervision of all school buildings, of repairing, refurnishing and improving them, and also responsibility for recommending employment of all teachers and janitors in the county school system.
In June of 1956, James Investment Company was organized as a Florida corporation, with five share holders putting up $8,000 apiece for 22 shares each of the capital stock. In July, 1957, Greco and Farnell, two of the original five organizers, bought out their associates, each retaining *756 his 22 individual shares and retiring the purchased shares as treasury stock. Greco became president and treasurer of the corporation, Farnell vice president, and Mrs. Greco secretary, this arrangement continuing down through the years.
About the time the corporation was organized, it acquired by purchase an 80 acre tract in the northwest area of Hillsborough County, 25 acres being in citrus grove, and having frontage on three lakes. The improvements on the property consisted of a 2-story house, a caretaker's house, a large barn, and also a building known as the bunkhouse.
The property was operated during the summer months of 1957 and '58 as a day camp for children by a Mrs. Callahan, under name of Camp Whipporwill. In 1959, 1960 and 1961 it was operated by one Stalnaker, who changed its name to Camp Oconee. During 1962 and 1963 it was operated by a Mrs. Williams. In 1964 and 1965, the camp was operated by three people, Baker, Kreher and Walker. During all these years, when the camp premises were available it would be utilized by religious, social, and fraternal organizations, schools, churches and industrial groups for outings, meetings, camping, picnics, fishathons, etc., usually without charge.
The foregoing is a brief background setting for the case. We now proceed to consideration of the more immediate aspects.
As before stated, there was evidence at the trial that workers in the school system took school supplies to Camp Oconee and the Odessa premises,[4] that they did work there,[5] and on occasions repaired or repainted at the school maintenance warehouses articles belonging to the two places.[5]
The State contends that this raft of hearsay testimony was admissible against Farnell under the "co-conspirator exception to the hearsay rule". It is the law that "[e]very act and declaration of each member of a conspiracy * * * is * * the act and declaration of them all, and is therefore original evidence against each of them". Mercer v. State, 1898, 40 Fla. 216, 24 So. 154; Roberson v. State, 1898, 40 Fla. 509, 24 So. 474.
But it is also the law that, before the "co-conspirator rule" may be invoked there must first be "independent evidence of the existence of a conspiracy, and of the objecting party's participation in it". Duke v. State, 1938, 132 Fla. 865, 134 Fla. 456, 185 So. 422; Rogers v. United States (CA5 1964) 334 F.2d 83, cert. den. 380 U.S. 915, 85 S.Ct. 892, 13 L.Ed.2d 800; Carbo v. United States (CA9 1963) 314 F.2d 718. In other words, proof of a conspiracy is necessary "* * * for the purpose of establishing the * * * criminal liability of the conspirators for the unlawful acts of their co-conspirators in furtherance of the common purpose". 6 Fla.Jur. § 17, p. 249.
In Brown v. State, 1937, 128 Fla. 762, 175 So. 515, the Supreme Court reiterated "the usual rule that upon the trial of an *757 indictment for a substantive offense, evidence is admissible to prove a conspiracy to commit the substantive crime charged in the indictment (although no conspiracy is charged in such indictment) on the theory that the principal crime charged may itself be established by first proving the formation and execution of a pre-existing conspiracy out of which its accomplishment was realized in the completion of the substantive offense". (Emphasis supplied).
In the Carbo case, supra, it was held that the "necessary foundation" for admission of hearsay testimony under the co-conspirator exception 
"* * * consists of three distinct prerequisites. First: that the declaration is in furtherance of the conspiracy; second: that it was made during the pendency of the conspiracy; third: that there is independent proof of the existence of the conspiracy and of the connection of * * * the defendant with it". (Emphasis supplied).
Montford v. United States (CA5 1952) 200 F.2d 759, was a Federal case from Florida, opinion written by Circuit Judge Strum, formerly Chief Justice of the Florida Supreme Court, involving this question. In that case Judge Strum, speaking for the unanimous 5th CCA, held:
"The declarations of one conspirator made in furtherance of the objects of the conspiracy, and during its existence, are admissible against all members of the conspiracy. Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429. But a defendant's connection with a conspiracy cannot be established by the extra-judicial declarations of a co-conspirator, made out of the presence of the defendant. There must be proof aliunde of the existence of the conspiracy, and of the defendant's connection with it, before such statements become admissible as against a defendant not present when they were made. Glasser v. United States, 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680, 701; Minner v. United States, 10 Cir., 57 F.2d 506; May v. United States, 84 U.S.App.D.C. 233, 175 F.2d 994; United States v. Nardone, 2 Cir., 106 F.2d 41, reversed on other grounds, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307". (Emphasis in text).
The above quotation from Montford was quoted with approval by the same 5th Circuit Court in Orser v. United States (CA5 1966) 362 F.2d 580, citing also Panci v. United States (CA5 1958) 256 F.2d 308.
In Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, a conspiracy case, the U.S. Supreme Court, noting the government's contention that "the declarations of one conspirator in furtherance of the objects of the conspiracy made to a third party are admissible against his co-conspirators", qualified such contention by stating that 
"* * * such declarations are admissible * * * only if there is proof aliunde that he is connected with the conspiracy. Minner v. United States, 10 Cir., 57 F.2d 506; and see Nudd v. Burrows, 91 U.S. 426, 23 L.Ed. 286. Otherwise hearsay would lift itself by its own bootstraps to the level of competent evidence." (Emphasis supplied).
In Ong Way Jong v. United States (CA9 1957) 245 F.2d 392, Ong Way Jong and Wee Zee Yep were jointly indicted in the Federal Court for narcotics violation. Ong pleaded not guilty and went to trial before the Judge without jury. Wee did not testify. Ong was found guilty of a count charging conspiracy with Wee. Upon appeal, the conviction was reversed with directions to acquit. The opinion reviewed the evidence in detail, consisting of hearsay testimony as to previous statements by Wee, which was allowed in evidence without sufficient independent proof of a conspiracy between Ong and Wee. The observation by the Court on appeal is strikingly applicable to the instant case:
"The excellent trial judge made the mistake of considering a mass of evidence *758 which was only admissible against Wee. It is an unquestioned rule of law that there must be substantial evidence of a conspiracy before the acts and declarations of a supposed conspirator become admissible against any other defendant if these are not done or said in his presence. This is because such acts are transactions between third parties, with which the other defendant has not shown by other evidence to have a connection. These matters are hearsay as to him."
 quoting with approval the language of Justice Jackson in Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790:
"Strictly, the prosecution should first establish prima facie the conspiracy and identify the conspirators, after which evidence of acts and declarations of each in the course of its execution are admissible against all. But the order of proof of so sprawling a charge is difficult for a judge to control. As a practical matter, the accused often is confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended or even known about, but which help to persuade the jury of existence of the conspiracy itself. In other words, a conspiracy often is proved by evidence that is admissible only upon assumption that conspiracy existed." (Emphasis in text).
Kight v. American Eagle Fire Ins. Co. of New York, 1936, 125 Fla. 608, 170 So. 664, was a civil case but it involved a suit to recover on a fire insurance policy where the defense was arson allegedly conspired in by the plaintiff. Admission of hearsay testimony to show complicity in the common design was at issue, and our Supreme Court laid down the rule of admissibility as follows:
"It is necessary in all cases that there be proof of conspiracy else evidence of the acts and declarations of one member is inadmissible against the other parties to the conspiracy. 3 Encyclopedia of Evidence, 424.
Before evidence of the acts and declarations of persons not parties to the action can be properly received in evidence, in cases of this character, the common unlawful design should be clearly proved, as a condition precedent to receiving evidence of such acts and declarations at all. Evidence which is merely admissible on the question of the common illegal purpose, is not sufficient. * * *
The common purpose, as before remarked, must be clearly proved. Evidence which might be sufficient to submit to a jury on a question proper to be submitted to them, will not answer the requirement. It should be so strong as to make it their imperative duty to find in the affirmative, if the question were to be submitted to them, and where the court would set their verdict aside in case they did not so find. Jones v. Hurlburt, 39 Barb. (N.Y.) 403, 409." (Emphasis supplied).
In Kuhn v. United States (CA9 1928), 26 F.2d 463, the 9th Circuit Court of Appeals said that 
"* * * giving to the rules of evidence in conspiracy cases the widest reasonable latitude, we are aware of no principle under which the declaration of one conspirator to another is competent to establish the connection of a third person with the conspiracy."
In Minner v. United States (CA10 1932), 57 F.2d 506, the 10th Circuit Court said:
"To render evidence of the acts or declarations of an alleged conspirator admissible against an alleged co-conspirator, the existence of the conspiracy must be shown and the connection of the latter therewith established. (Cases cited).
Declarations of one conspirator to another are not competent evidence to establish *759 the connection of a third person with the conspiracy. (Cases cited).
The existence of the conspiracy cannot be established against an alleged conspirator by evidence of the acts or decclarations of his alleged co-conspirators done or made in his absence." (Cases cited).
In United States v. Bentvena (CA2 1963), 319 F.2d 916, the 2nd Circuit Court said:
"Although it is clear that the hearsay declarations of a conspirator are admissible against his co-conspirators if made pursuant to and in furtherance of the conspiracy, Clune v. United States, 159 U.S. 590, 593, 16 S.Ct. 125, 40 L.Ed. 269 (1895); Fiswick v. United States, 344 U.S. 604, 617-18 (1953), it is equally clear that there must be independent evidence establishing a defendant's participation in the conspiracy before such declarations are admissible against him. Glasser v. United States, 315 U.S. 60, 74-75, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Consolidated Laundries Corp., 291 F.2d 563, 576 (2d Cir.1961); United States v. Stromberg, 268 F.2d 256, 265-67 (2d Cir.1959). A defendant's `participation in the conspiracy which the Government sought to prove can be established only by proof, properly admitted into evidence, of their own words and deeds.' United States v. Russano, 257 F.2d 712, 713 (2d Cir.1958). Such independent proof must be substantial and not `too slight.' United States v. Consolidated Laundries Corp., supra; United States v. Stromberg, supra."
We have belabored this opinion with many citations. But the point is so crucial to our disposition that we feel justified in exploring it perhaps unduly. Without the testimony of the several school employees that they were "instructed" or "ordered" or "directed" to do the work at Camp Oconee or carry the various commodities or materials there, the State had no case against Farnell, at least on the present record.
We have omitted reference to the numerous cases from other State Court jurisdictions holding in accord, preferring the enunciations of our Supreme Court and the Federal Courts at the appellate level, particularly the 5th Circuit Court cases from Florida. The Federal decisions on conspiracy are profuse.
The State's brief filed here, in its only reference to independent proof of conspiracy, says that 
"* * * the conspiracy was established by the testimony of witness Clements which appellant alludes to in his brief".
We suppose, without anything more specific, that it refers to an incident occurring sometime "prior to the latter part of March of 1958". Clements testified that on an occasion at "the old horse barn" he and Jimmy Johnson were discussing "the difficulties in raising and realigning the roof" where the "beams were sunken down considerably" and Farnell remarked to Johnson "I just don't want to know anything about it. Just go ahead and get it done".
This remark was of relatively little significance, considering the whole spectrum of the case. Allegedly, it was made almost nine years before the trial. It could have been made on a weekend or when Clements was off duty, and on occasions Farnell paid by tips for such work, in which event it would have been a natural statement. Also, it was a typical remark an executive would make to a subordinate, without knowing the circumstances under which the work was being done. And lastly, the remark was made as to work performed at the camp which had been ruled out of the case by Court order prior to trial, and did not in any way pertain to articles delivered to the camp, which was the subject matter of the embezzlement charge.[6]
*760 One other item of evidence by the school worker Hooker, not even mentioned in the State's brief, was that Johnson remarked "the Old Man wanted this done", referring to work at the camp. This likewise is of negligible probative force. Who "the Old Man" was is speculative. The remark attributed to Johnson did not presume to quote Farnell, who was not present. It was the expression at best of only an opinion. And again, lastly, it referred to work rather than articles allegedly embezzled.
The foregoing are the only items of evidence in the entire 11 volumes of the record, covering a period of approximately ten years, which could be considered proof aliunde of a conspiracy connecting Farnell. We are clearly persuaded that such proof is "too slight" and "too tenuous", to quote Bentvena, and "too insubstantial", to quote Ong.
In concluding on this point, we emphasize again that James Johnson never testified as a witness, nor was he being tried. As against him individually the testimony of the school workers would have been admissible. It is true that Johnson was a co-defendant, but this in no way dispensed with necessity for independent proof of conspiracy as to a third party, otherwise it would blithely open the door by the simple expedient of joining him in the charge.
It is also to be noted that Camp Oconee was not owned by Farnell. It was owned by James Investment Company, a corporation, which in turn was owned equally by Farnell and James Greco. Actually the evidence is as susceptible of showing a conspiracy between Greco and Johnson as between Farnell and Johnson. Greco was president and treasurer of the corporation and was at least equally the recipient of any articles going to the camp or work performed there. And Greco, like Farnell, had been a responsible executive in the school system, having in effect hired the school working personnel. It was not even intimated that Greco was implicated in any unlawful enterprise.
We hold that the necessary independent proof of a conspiracy connecting Farnell was insufficient and that the evidence introduced upon such theory was erroneously admitted.

(2) Evidence of other offenses and transactions.

The amended information predicated the embezzlement charge against Farnell upon the delivery of lumber, paint, building materials, hardware, etc., belonging to the school board, to "Camp Oconee * * * by employees working subordinate to * * * James A. Johnson", from January 1, 1958 to October 3, 1966. But despite the limitations thus fixed by the State itself, the prosecution expanded its case at trial to cover 10 instead of 8 1/2 years in time, places in 3 counties instead of 1, and the subject matter of work and labor in addition to tangible objects.
And no time was lost in expanding the sphere. The first worker-witness Clements testified that he helped lay a pipeline at the camp in 1956, and that in 1957, on a Saturday, he drove a school bus 160 miles north of Tampa to Lake City in Columbia County where he picked up "a load of * * * horse feed" at Farnell's farm and brought it back and "unloaded it in the barn" at Camp Oconee, where some horses were kept. Also in 1957 he carried a dozen rolls of cement roofing to the camp which he attached to a building roof, also some first aid supplies and janitorial supplies; that on occasions in the same year 1957 he took several 5-gallon cans of gasoline, also operated a camp tractor in mowing grass at the camp, and with other employees "on a Saturday" cleaned out a septic tank there. It was in 1956 that he also cleaned and repaired some window screens at the camp. He had done no work at the camp since July of 1958.
*761 There was much testimony about activities at the Odessa premises. Farnell, in partnership with a television executive and a prominent Tampa lawyer, in 1960 acquired a three-eighths interest in a tract of wood land near Odessa in Pasco county, upon which was a run-down farmhouse which they allowed one Ralph Gonzalez to occupy, provided he made necessary repairs. Billy Hooker testified he on occasions took paint, pipe, lumber, etc., to the premises about 1961, always at the sole direction of Jimmy Johnson. He never saw Farnell there. Benicio Martinez in 1961 was directed by Johnson to go to the Odessa property, where with Johnson, Griffin and Ralph Gonzalez, "they tore off the old roof and took the tin off and I have not been back since".
Such was the character of testimony as to "other offenses" which the State introduced against Farnell over persistent objections.
The State relied for admission upon Williams v. State, Fla. 1959, 110 So.2d 654, wherein the Supreme Court held that "relevant evidence will not be excluded merely because it relates to similar facts which point to the commission of a separate crime. The test of admissibility is relevancy. The test of inadmissibility is a lack of relevancy". (Emphasis in text). And specifically, such evidence was held to be admissible if it is "relevant to a material fact in issue except where the sole relevancy is character or propensity of the accused" or is otherwise "precluded by some specific exception or rule of exclusion". (Emphasis supplied). An instance of such relevancy is where it serves to demonstrate "a plan or pattern followed by the accused in committing the type of crime laid in the indictment".
This 2nd District Court had occasion to analyze Williams in Green v. State, Fla. App. 1966, 190 So.2d 42, wherein we said that 
"* * * as we read Williams, the essential characteristics of evidentiary admissibility have not been materially altered. Evidence of other offenses which was admissible before Williams has been generally held admissible since Williams, and will undoubtedly continue so to be held in the future; and vice versa as to inadmissibility.
We analyze Williams to mean that evidence of other offenses is admissible if 
 it is relevant and has probative value in proof of the instant case or some material fact or facts in issue in the instant case; and
 its sole purpose is not to show the bad character of the accused; and
 its sole purpose is not to show the propensity of the accused to commit the instant crime charged; and
 its admission is not precluded by some other specific exception or rule of exclusion."
And thereafter in Winkfield v. State, Fla.App. 1968, 209 So.2d 468, this Court, speaking through Judge Allen, requoted with approval the above language from Green.
Applying the rationale of the above cases to the "similar fact" evidence adduced here, we are of the view that such evidence, covering alleged transactions at places other than Camp Oconee and in counties other than Hillsborough, and which extended to occasions 9 and 10 years back, should not have been admitted; especially under the admonition of Williams that such character of testimony "should be cautiously scrutinized before it is determined to be admissible".
From the record, the evidence here was apparently admitted on the theory that "it demonstrated a plan or pattern followed by the accused". But reaching back to 1956 and 1957 to show a "scheme or pattern" for violating the law was prejudicially unnecessary, the same as if beating on a lame horse. The State had already *762 allotted to itself the time gap from January, 1958 to October, 1966 within which to prove its case against Farnell. It would seem as if this time span of almost nine years would have been more than ample to prove any "pattern" for embezzling school property. Ordinarily two years is allowed the State to prove offenses. Here the State had already given itself several times this back-span. And to go back a year or two more would be stretching the open season from obsolescence to antiquity. And to extend it to two additional counties other than that specified in the charge is likewise unreasonable.
The statutes of limitation, as well as bills of particulars, have not as yet been completely done away with, and this case affords an excellent example of the necessity to call a halt on unnecessary excesses. We hold admission of the "similar fact" evidence, under the particular facts of this case, to be error.

(3) Evidence of work and labor performed.

As first mentioned herein, the Court held before trial that work and labor by the school employees was not a "commodity" subject to embezzlement. The original information had alleged that Farnell embezzled school property consisting of (1) tangible objects such as hardware, paint, gasoline, etc., and (2) work, labor and services. Motion to quash was directed to the latter classification as not being a permissible item of embezzlement. The Court upheld such contention and quashed the information. The amended information, which was thereupon filed, omitted all references to "work, labor and services" and confined the subject matter of embezzlement to tangible objects and personalty. It was upon this amended information that Farnell was tried.
However, when the trial began the Court opened the door to the entire category of "work, labor and services" and overruled all objections thereto. Thus, school employees Clements, Hooker, Gonzalez, Martinez, Valenti, Grillo and Nales, Sr., and Jr., were allowed to elaborate upon the various types of work they performed at Camp Oconee, the Odessa house, and the Lake City farm, over a period of 10 years. In the margin we set forth evidentiary examples of the work testified to by the various workers.[7]
During testimony of the first worker-witness Clements it became obvious that the jury was concerned about the work and labor performed. Two jurors interrupted to inquire whether the work at the camp "was all done on the weekend, or possibly during the week, or when it was done", *763 to which the witness answered "both"; and as to whether the witness was "paid extra for that, or during the week, was he paid extra for that, or how was he paid?".
Again, during the testimony of another worker a juror asked, "what kind of work were you being asked to do?" and when the witness replied "to paint the garage at Lake Oconee", the juror commented, "that's all I want to clarify."
Defense counsel pointed out that the jury was patently considering as evidence "the very matters that this Court held by its order was not to be considered as evidence, * * * namely, any services or labors that might have been performed by anyone at Camp Oconee", and vigorously argued that the Court "instruct them [the jury] that they are not to give any consideration * * * regarding anybody * * * doing any labor insofar as that might be considered as property subject to being converted".
The Court replied, "I think * * * what I will do is, when I finally instruct the jury I will clarify that question, at that time".
Defendant's counsel also moved for a mistrial because "the Court has permitted the witnesses to testify * * * concerning labor and services performed" contrary to the Court's initial order that it was not "property that was subject to embezzlement." The motion was denied and the State continued on undeterred, loosing a veritable avalanche of such testimony.
In his charge to the jury, the Judge stated the following:
"Gentlemen, evidence has been produced before you regarding certain employees of the Board of Public Instruction allegedly performing work, labor, or services at Camp Oconee. I charge you that such personal work, services, or labor, allegedly performed at Camp Oconee by public employees do not constitute embezzlement under the law and, thus, cannot be considered by you as properties subject to embezzlement or conversion by the defendant as charged in the Amended Information."
This was the Court's only instruction to the jury on the point involved, and came just before the close of his 52 pages of charges and after the jury had listened for days to a continual narration by numerous witnesses detailing the items of work done. And even here they were not told why the evidence was admitted. They were simply advised that such evidence "cannot be considered by you". And, peculiarly enough, the testimony was never actually stricken.
The evidence was clearly inadmissible and manifestly error. The only question remaining is whether it was prejudicial error. In our opinion it was. Conspicuous evidence of this were the occasions when the jurors interrogated the school employees about the work done.
The rule is that a judgment of conviction in a criminal case will not be reversed because of the admission of evidence which was clearly not prejudicial to the defendant, although it may have been irrelevant or immaterial. Luke v. State, Fla. App. 1967, 204 So.2d 359; Smith v. State, Fla.App. 1967, 199 So.2d 503; Farley v. State, 1924, 88 Fla. 159, 101 So. 239; Winnemore v. State, Fla.App. 1963, 150 So.2d 277; Bowden v. State, Fla.App. 1962, 137 So.2d 621; McClendon v. State, Fla. 1967, 196 So.2d 905. It is the corollary rule that the admission of irrelevant evidence prejudicial to the defendant over his objection is reversible error. Wolf v. State, 1917, 72 Fla. 572, 73 So. 740; Alvarez v. State, 1918, 75 Fla. 286, 78 So. 272; Watkins v. State, 1915, 69 Fla. 355, 68 So. 176.
In Hartman v. State, 1935, 121 Fla. 627, 164 So. 354, Judge Terrell wrote the opinion reversing an embezzlement conviction because of admission in evidence of embezzled property other than that for which the defendant was on trial, holding that "[w]e are not entirely satisfied that the instruction of the trial court to disregard such evidence completely removed its evil *764 effect" and remarking further that "[e]vidence not tending to prove the charge involved, but which relates to wholly separate and distinct transactions should not be permitted. [Citing cases]".[8]
In Gunn v. State, 1919, 78 Fla. 599, 83 So. 511, testimony had been erroneously admitted at the trial and the question before the Supreme Court was whether it was harmful. The Sheriff of the County had over objection given testimony as to defendant's movements out of town after the alleged offense was committed, to raise a presumption of guilt by flight. In reversing, the Supreme Court said:
"It is contended that * * * no harm could have been done by the admission of the sheriff's testimony. Then why was it offered by the state and admitted by the court? Surely not merely to consume time and swell the record? * * * Having gotten it before the jury over the objection of the defendant, and a conviction obtained, the state cannot be heard to say it was harmless error. Who can say that the testimony * * * did not and could not have the effect that the state's attorney intended?"
In Pensacola Transit Co. v. Denton, Fla. App. 1960, 119 So.2d 296, the 1st District Court considered the effect of erroneously admitted evidence going to the jury, and in reversing said:
"The injection of such an influence makes the task of an appellate court an impossible one. No one on earth can tell with certainty the full effect of that influence upon a juror's mind. * * * Then, again who can tell whether a judge's instruction to disregard [it] would not serve to emphasize the fact * * * rather than to eliminate it from his mind? The only acceptable answer to this problem is for the bench and bar religiously to keep every improper influence of every nature from coming before a jury, lest such influence act as a festering sore and result in a miscarriage of justice."
In San Fratello v. United States (CA5 1965), 340 F.2d 560, the Federal appellate Court had the same question in a case from Florida and, holding the error to be harmful and reversing, said:
"The rule is well settled that generally an appellant has the burden of showing both error and injury resulting from it. Baker v. United States, 5 Cir., 156 F.2d 386 (1946); Wells v. United States, 5 Cir., 158 F.2d 932 (1947); Escalante v. United States, 5 Cir., 228 F.2d 61 (1955). That burden is discharged where the record shows error which, `within the range of a reasonable probability, may have affected the verdict.' Braswell v. United States, 5 Cir., 200 F.2d 597, 602 (1952); Bacino v. United States, 10 Cir., 316 F.2d 11, 14 (1963). Also, if the error is of such a nature that its natural effect is to prejudice a defendant's substantial rights, it must affirmatively appear from the record to be harmless in order for the conviction to be upheld. McCandless v. United States, 298 U.S. 342, 347, 56 S.Ct. 764, 766, 80 L.Ed. 1205, 1209 (1935); Kotteakos v. United States, 328 U.S. 750, 760, 66 S.Ct. 1239, 90 L.Ed. 1557, 1564."
And in Odom v. United States (CA5 1967), 377 F.2d 853, another case from Florida, the Federal Appeals Court, in considering the harmful effect of a jury being first exposed to inadmissible testimony, then instructed to disregard it, said in reversing the conviction:
"The judge's words were here at most a mild antiseptic with no prognostic or retrospective assurance that they eliminated the sepsis.
* * * * * *
Juries do not facilely forget, and * * * [t]he attempt to sanitize testtimony by admonition may sometimes succeed, but its success will very often *765 depend upon how virulent the diseased testimony was."
Here the situation has two additional aggravating features, (1) the trial Judge allowed such testimony to go to the jury knowing in advance it was improper, and (2) the jurors were subjected to a literal barrage of it for several days. After all, the jury was composed of human beings, not computers. Their mental processes were not as flexible as an accordian nor as inflexible as a faucet. The rules of evidence were primarily designed to shield from their ears that they should not hear and from their eyes that they should not see. It would have been humanly impossible for them to cast from their minds in one instant what they had been hearing and seeing for a week.
Justice Cardozo in Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196, in dealing with the harmful effect of testimony erroneously admitted, had this to say:
"The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed. They have their source very often in considerations of administrative convenience, of practical expediency, and not in rules of logic. When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out. Thayer, Preliminary Treatise on the Law of Evidence, 266, 516; Wigmore, Evidence, §§ 1421, 1422 1714. These precepts of caution are a guide to judgment here."
We cannot but remember the immortal lines from Omar Khayyam's Rubaiyat, Stanza 71:
"The Moving Finger writes; and, having writ, Moves on: nor all your Piety nor Wit, Shall lure it back to cancel half a Line, Nor all your Tears wash out a Word of it."
Concluding, and in retrospect upon the whole case, we emphasize that this was a criminal prosecution, and only one man was on trial, J. Crockett Farnell. Criminal prosecutions, as distinguished from other forms of official sanctions, are inherently personal in character. In this category the prosecution must show the guilt, beyond every reasonable doubt, of the particular individual on trial, of the specific criminal offense charged. Knowledge itself may not be enough. Actual criminal participation is requisite. In the other category, comprising sanctions of suspension from office, removal, expulsion, censure, or impeachment, no such rigid rule applies. Mere knowledge of depredations or irregularities in administration of an office may be sufficient. Or even negligence in not knowing.
In other words, we are not concerned here with malfeasance, misfeasance, or nonperformance of official duty, or even unethical deviations from official rectitude. What this Court is concerned with, and that alone, is the right of Farnell to be accorded a fair trial in a criminal case according to the traditional modes of established legal procedure.
Reversed and remanded.
ALLEN, Acting C.J., and HOBSON, J., concur.
NOTES
[1] This is permissible. F.S. § 932.06 F.S.A. provides:

"All offenses by state, county or municipal officials, committed during their term or terms of office, in any way whatsoever connected with the discharge of the duties of their different offices, shall be prosecuted within two years after the said officer shall retire from such office." See State v. Bruno, Fla. 1958, 107 So.2d 9.
[2] "812.10 Embezzlement by state, county or municipal officers

Any state, county or municipal officer who shall:
(1) Convert to his own use;
(2) Secrete with the intent to convert to his own use; or
(3) Withhold with the intent to convert to his own use,
(a) Any money, property or effects belonging to or in the possession of the state, county, city or town, whose duty requires him to receive said public money, property or effects; or
(b) Any money, property or effects of another, the duty of which office requires him to receive said money, property or effects, shall in every such act be deemed guilty of an embezzlement of the money, property, or effects so converted, secreted or withheld, * * *.
* * * * *
This section shall apply to any deputy, clerk or employee in any state, county or municipal office, and to all school officers."
[3] Two minor school employees, Valenti and Grillo, testified as rebuttal witnesses that on occasions they did carpentry and roofing repair work at Camp Oconee at direction of their immediate supervisor, Webster Griffin, who presumably was a subordinate of Johnson.
[4] Testimony of J.G. Clements, Billy Hooker, Reinaldo (Ray) Gonzalez, and Manuel Nales, Jr., all truck drivers working out of the school book depository; also Benicio Martinez, assistant manager of the book depository; also Manuel Nales, Sr., of the school plumbing department; and also Calvin Baker, assistant superintendent of school buildings and grounds, was, collectively, that they took from the school warehouses or depositories asserted items of merchandise, equipment or supplies, consisting of building materials such as lumber, roofing, masonite, plywood, cement, and paints; hardware material such as nails, screwdrivers, window saches and screens, pipe, garden tools, hose and rakes; janitorial supplies such as brooms, mops, pine oil, wall cleaner, rags, Ajax and toilet brushes; office supplies such as typewriter ribbons, typewriter paper, wastepaper baskets, ink erasers, large and small scratch pads, marker-like pencils; first-aid kits such as iodine, bandages, band-aids, tape, medicine, and ointments for scratches and burns; miscellaneous commodities such as light bulbs and gasoline; and on one occasion a new toilet and tank to replace one that was cracked.
[5] See Points (2) and (3) infra.
[6] See Point (3) infra.
[7] Clements: helped lay a pipe line; brought back a load of horse feed from Lake City; did "carpentering, painting, altering some buildings, whatever came to hand"; applied novelty siding lumber to the outside wall of the bunkhouse; applied paint to some of the buildings and also the dock pier; attached several rolls of cement roofing to a building roof; mowed the grass with a camp tractor; cleaned out a septic tank; repaired window screens; and did "work of various nature".

Nales, Sr.: installed a toilet, aided by his son; hooked up a sink; replaced a cracked toilet.
Nales, Jr.: helped his father with the toilet and tank; cut grass with a tractor; took lawn chairs to be repaired and painted; helped paint the garage; at Odessa painted the inside and outside of the frame house, and pulled up and removed a large Australian pine that had blow over the driveway, using a chain saw.
Gonzalez: did "painting and a little bit of carpenter work and odds and ends"; painted the shower room of the main building; did lumber and carpenter work in the stables; help mow grass with the tractor; helped install steel gates on the horse stalls.
Martinez: painted the inside of the big house and also helped paint the garage adjacent; helped tear off an old roof; "did some raking, general cleaning up".
Valenti: did carpenter work and made a bath house; repaired some doors and windows that were stuck; moved one wall; did work on the roof.
Grillo: did carpenter work on the garage building; moved a partition.
Hooker: helped moved a "cabinet with a sink".
[8] Cf. Point (2) supra.