261 So.2d 522 (1972)
Nathaniel PRESSLEY, Appellant,
v.
The STATE of Florida, Appellee.
No. 71-91.
District Court of Appeal of Florida, Third District.
May 2, 1972.
Rehearing Denied May 24, 1972.
*523 Engel & Halpern and John A. Boccabella, Miami, for appellant.
Robert L. Shevin, Atty. Gen. and Joel D. Rosenblatt, Asst. Atty. Gen., for appellee.
Before BARKDULL, C.J., and PEARSON and HENDRY, JJ.
PER CURIAM.
The appellant, Nathaniel Pressley, was indicted, tried and convicted for murder in the first degree. The offense for which the jury found him guilty was alleged and proved to have been committed while Pressley and a co-defendant, Andre Murray Rhymes, were participating in an armed robbery of Stone's Grocery in Miami, on December 12, 1969, at 6:00 o'clock P.M. Pressley was sentenced to a life term in the state penitentiary.
The evidence tying Pressley to the murder included, among other things, the testimony of a Miss Johnson, a friend of Rhymes, as to statements made by Pressley on two occasions; by recovery from Rhymes upon his arrest of a chrome- or nickel-plated "Taurus Brazil" .38 calibre revolver which had been taken from an earlier robbery of the Family Grocery Store committed by Pressley and Rhymes; by implication, by recovery of an Italian "Eiger" .38 calibre revolver stolen from the murder victim which was given to Miss Johnson by Rhymes.
Lawrence Blades, an eighty-four year old Negro butcher employed at Stone's Grocery was shot five times with a .38 calibre Taurus Brazil pistol and died as a result of the wounds inflicted by the four armor-piercing conical bullets coursing through his chest; the fifth bullet lodged in his hand.
*524 Four witnesses who were present during the robbery were unable to identify anyone. Mr. Nathan, the owner testified that he saw two young (17-20 years old) Negro males, who robbed him of $400.00 to $500.00, shoot at Lawrence Blades. One of the robbers pointed a pistol at Mr. Nathan, a Caucasian.
A Miss Davis testified that when a few people, including Pressley, were in the washroom of "Peaches'" (an acquaintance) apartment on the morning of December 14, 1969, Andre Rhymes admitting shooting the butcher at Stone's Grocery. She also testified that several days later at Uncle Willie's house, while only she and Rhymes were present, Rhymes told the witness that "... when you do wrong you have to pay for it, and that he [Rhymes] shot the butcher at Stone's market." As to this testimony concerning the conversation at Uncle Willie's house, the trial judge instructed the jury that this evidence applied only to Rhymes and therefore could be considered by the jury as against Rhymes but not as to Pressley.
Miss Johnson testified that on December 14, 1969, while several persons were present in the bedroom of Peaches' apartment, she had a conversation with Pressley and Rhymes. At that time Rhymes told Miss Johnson that he robbed Stone's Grocery and had shot Mr. Blades. Pressley, who was sitting on the bed with Rhymes said, "`I told you, you should have killed the white man, too.'" Miss Johnson also testified that after Rhymes said that about $400.00 was taken from Stone's Grocery, Pressley said, "`I told you, you talk a little too much.'"
Miss Johnson further testified that one evening in December while she, Rhymes and Pressley were walking, Rhymes stated that he was standing outside the Family Grocery Store when Pressley went into the grocery store and that Pressley took a long silver gun from the store.
On another occasion, between December 14 and 17, 1969, Miss Johnson told Rhymes that she wanted a gun. Rhymes and the witness went up to Peaches' apartment where Rhymes showed her a silver gun which she recognized as State's Exhibit No. 9 (a chrome- or nickel-plated Taurus Brazil .38 calibre pistol). Rhymes said that the silver gun came from the Family Grocery Store and that, "He told me he had used the gun in some killings." The trial court again instructed that since Pressley was not present, according to the testimony, this evidence could be applied only against Rhymes and not against Pressley.
At the trial Miss Johnson then identified State's Exhibit No. 5 (a .38 calibre Italian "Eiger" revolver) as the revolver which Rhymes had given her on the morning of December 17, 1969, when Rhymes had cautioned her: "`Don't let nobody take this gun from you or see this gun because this is the gun that came from Stone's Grocery store, off the butcher, Mr. Blades.'" No objection or request for a cautionary instruction was made, and none was given at this point. She turned over the "Eiger" revolver to the policeman Bonner and Sgt. Gonzalez.
Miss Manning, an employee of the Family Grocery Store, testified that during a robbery of that market on December 10, 1969, Pressley stole a .38 calibre "Taurus Brazil" pistol. From the testimony of several witnesses it was made to appear that the stolen gun was purchased in 1969 by Mr. Dixon who loaned it in October, 1969, to Mr. Moncour, who worked at the Family Grocery Store.
On the night of December 14, 1969, Sgt. Gonzalez, of the Homicide Division of The Miami Police Department had occasion to go to the apartment of Rhymes' parents. While talking with Rhymes' parents, Sgt. Gonzalez noticed a chrome-plated revolver in a drawer there.
On the evening of December 17, 1969, Sgt. Gonzalez and two other officers went to Rhymes' own apartment to arrest him. During the arrest, Rhymes dropped a .38 calibre Taurus Bazil revolver which the police recovered. The trial court, pursuant *525 to Pressley's motion, instructed the jury that this testimony could be considered only as against Rhymes, but not as being against Pressley.
A ballistics expert testified that four of the five .38 calibre shells recovered from Blades' body, clothing and floor next to his body were fired from the Taurus Brazil pistol  and the fifth slug was also probably fired from that gun. A finger-print expert testified that one latent print of Rhymes was found on the Taurus Brazil pistol.
Pressley for reversal contends that: (1) a 12 x 15" photograph of the deceased was erroneously entered into evidence for lack of relevance; (2) that the court denied due process by admitting evidence showing his propensity to commit crime; (3) the court abused its discretion in finding Pressley competent to stand trial; (4) the State failed to prove a prima facie case; (5) the evidence is insufficient to support a conviction; (6) that despite certain cautionary instructions, the court erred in denying pretrial and trial motions to sever; (7) the court erred in limiting the defense's cross-examination of Police Officers Bonner and Gonzalez as to Miss Johnson's credibility.
The court did not err in admitting into evidence a 12 x 15" black-and-white glossy photograph of the deceased lying dead on the floor of the murder scene, taken within one hour of the commission of the crime. "... photographs are admissible in evidence if they tend to illustrate or explain the testimony of a witness." Grant v. State, Fla. 1965, 171 So.2d 361, 363. The picture showed the victim's right front trouser pocket was turned inside out. Admittedly, there was a blood stain on the apron along his right side. When the photograph was admitted, Mr. Nathan's testimony warranted the inference, later confirmed by Miss Johnson's direct testimony, that Blades' pistol was stolen from him during the robbery. The photograph was not gruesome and was not posed; it was taken at the scene of the crime shortly after its commission and discovery. It accurately portrayed the setting. Therefore, it is admissible in evidence as illustrating or explaining the testimony of Mr. Nathan or assisting the jury in understanding the testimony. Kitchen v. State, Fla. 1956, 89 So.2d 667, 668.
The "Williams Rule" on admissibility of evidence of other crimes in the trial of another offense is: "... relevant evidence will not be excluded merely because it relates to similar facts which point to the commission of a separate crime." [Italics in original.] Williams v. State, Fla. 1959, 110 So.2d 654, 659. Pressley relies upon Franklin v. State, Fla. App. 1970, 229 So.2d 892. In case sub judice the "Williams Rule" was not violated, and Franklin v. State, supra, at 893-894, supports this determination.
Next, Pressley contends that the court abused its discretion by finding him competent to stand trial. Pursuant to a motion under Rule 1.210 RCrP, 33 F.S.A., the court appointed two psychiatrists to examine Pressley. The doctors examined him at the jail, filed reports with the court, and on April 2, 1970, testified at a sanity hearing. In their opinion Pressley was at the time of hearing paranoid; Dr. Corwin concluded he suffered from schizophrenia but Dr. Jaslow did not so conclude. Dr. Corwin determined that Pressley could not assist his counsel because Pressley "was suspicious, wary, guarded, evasive, and his  what to me were his delusions would impair his ability to work with anyone  with counsel." However, Dr. Jaslow determined that Pressley could assist his counsel in preparing his defense because "... he had sufficient awareness; that he had sufficient capability to recall; that he understood the nature of the charges, and therefore could assist counsel, although he did deny, of course, the events and, therefore recollection of the events  but without that, I felt he could assist his counsel." The testimony of the two psychiatrists, *526 Pressley's mother and his counsel revealed that Pressley had often taken drugs; it was stipulated that the testimony of Pressley's father would be identical to that of Pressley's mother. The factual question to be determined was: whether at that time the accused was in such possession of his mental faculties as to enable him to comprehend his condition with reference to the proceedings against him, and to rationally aid in the conduct of his defense. All the evidence showed that Pressley comprehended the charges and possible death penalty, but testimony conflicted as to the second element. On conflicting evidence, the judge sitting as the trier of facts, found Pressley competent to stand trial. The record demonstrates sufficient basis for this determination. See: Brown v. State, Fla. 1971, 245 So.2d 68, 70-72; Brock v. State, Fla. 1954, 69 So.2d 344 (en banc).
In the two points concerning the sufficiency of the evidence, Pressley emphasizes that no eye-witness was able to place him at the murder scene and complains that no physical evidence of his involvement was introduced. However, Miss Johnson testified that Pressley, in response to a statement by Rhymes that Rhymes had robbed the Stone's Grocery said: "`I told you, you should have killed the white man, too.'" Mr. Nathan, the Caucasian owner of that store, testified that one of the two young male Negro robbers pointed a pistol at him. Miss Johnson also testified that Pressley told Rhymes, "`... you talk too much.'" The Taurus Brazil revolver, the murder weapon, was shown to have been stolen by Pressley and Rhymes from the Family Grocery Store two days before the murder of Blades in Stone's market.
Pressley filed before, and at various points during, the trial motions to sever, and he urges that the court erred in not granting them, notwithstanding certain cautionary instructions given by the judge to the jury. We express the view that the appellant has not presented reversible error as to violations of the rule in Bruton v. United States (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, or otherwise.
Pressley next asserts that the court erred in limiting the cross-examination of police officer Bonner and Sgt. Gonzalez as to the credibility of Miss Johnson. Assuming that this point has been sufficiently preserved for review, it appears that no reversible error has been demonstrated because the police officers were questioned about Miss Johnson's background and credibility, as well as Miss Johnson herself being so questioned.
Pressley asserts the court committed fundamental error in refusing to grant a pretrial motion for change of venue because of a plethora of adverse pre-trial publicity. The exhibits of newspaper clippings are not so extensive as in Gavin v. State, Fla.App. 1972, 259 So.2d 544.
Therefore, for the reasons stated and upon the authorities cited, the judgment and sentence are affirmed.
Affirmed.
PEARSON, Judge (dissenting).
I must respectfully dissent. I would reverse the judgment for a new trial because I reach the conclusion that the appellant did not receive a trial free of prejudice when he was tried with co-defendant Rhymes. I would hold that the trial court committed reversible error when it denied appellant's motion for a new trial.
There was a pretrial motion for severance. The motion was renewed several times during trial, and the motion for new trial contained the ground that the failure to grant the motions for severance had resulted in prejudice to the appellant. It appears from the record that the crime for which appellant was tried was heinous and the attendant publicity was great. It may reasonably be stated that public indignation was present. Under such circumstances more than ordinary care is required to provide an impartial trial.
*527 It is clear that the evidence linking this defendant to the crime was not "overwhelming." In fact, if the statements attributed to defendant Rhymes were not admitted it is doubtful that the evidence would have been sufficient. Under these circumstances, the court should have granted appellant's motion for a new trial under the rationale of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, and Seidel v. State, Fla.App. 1970, 240 So.2d 521. See also Farnell v. State, Fla.App. 1968, 214 So.2d 753. Cf. United States v. Bentvena, 319 F.2d 916 (2d Cir.1963).