241 So.2d 399 (1970)
STATE of Florida, Appellant,
v.
Freddie Lee PITTS and Wilbert Lee, Appellees.
No. L-462.
District Court of Appeal of Florida, First District.
December 3, 1970.
*400 J. Frank Adams, State's Atty., and Leo C. Jones, Asst. State's Atty., for appellant.
Phillip A. Hubbart, Asst. Public Defender; Irwin J. Block, Barry N. Semet, Miami, and Maurice Rosen, North Miami Beach, for appellees.
RAWLS, Judge.
The State has appealed an order on a Criminal Rule 1.850 33 F.S.A. motion vacating the judgments and death sentences of Freddie Lee Pitts and Wilbert Lee for first degree murder of two attendants (Floyd and Burkett) of the Mo Jo Service Station in Gulf County.
Pitts and Lee in 1963, after being assured they would get a jury trial on the issue of mercy and that the State would not use pictures of the murdered victims, pleaded guilty to indictments charging first degree murder. Subsequent to accepting their guilty pleas, the trial judge empaneled a jury and conducted a jury trial upon the issue of mercy. At this trial Willie Mae Lee, an unwilling eyewitness to the robbery and abduction, after being sworn, took the stand and testified as to how she, the two defendants, Wilbert Lee's wife and Roland Lee Jones were together about midnight at the Mo Jo Station where they had a dispute about the use of the restroom. The six then went to Wilbert Lee's home where they were joined by three soldiers and one woman for a few drinks. About 2:00 a.m. she left with Freddie Lee Pitts in his car to get some vodka. After she got in the car she discovered that Wilbert Lee was lying down in the back seat. Over her protest the two men returned to the Mo Jo Station where Pitts took the money from the cash register, abducted the two attendants whom they took down the White City road to a secluded spot near the canal. There Pitts and Lee forced the attendants to climb through an iron gate and walk into the woods. Willie Mae heard shots from the car. She was returned to her home about daylight under the threat that if she told anyone she would never see her daughter again. Willie Mae Lee was not related to Wilbert Lee but they were close friends, and she often called him "Brother" and he called her "Sister."
Following the State's presentation of its case at the mercy trial, Pitts and Lee both freely testified admitting their actions and the truth of the preceding testimony. Their testimony corroborated that of Willie Mae Lee, and they further testified to facts that were unknown to Willie Mae such as the fact that Pitts took the gun from the Mo Jo Station on their first visit there about midnight. The jury refused to recommend mercy. On appeal, the *401 Florida Supreme Court affirmed the convictions and death sentences, Lee v. State, 166 So.2d 131 (1964). The Supreme Court of the United States denied certiorari, 380 U.S. 917, 85 S.Ct. 905, 13 L.Ed.2d 802 (1965).
In 1965 Pitts and Lee filed a motion to vacate on the grounds that the composition of the grand and petit juries was unconstitutional. The denial of this motion was affirmed by this Court in 1966, 188 So.2d 872. Certiorari was again denied by the Supreme Court of the United States, 386 U.S. 983, 87 S.Ct. 1292, 18 L.Ed.2d 234.
On December 19, 1967, Pitts and Lee filed the instant motion to vacate, represented by three attorneys from New York, one from Washington, D.C., and four from Miami. This motion and its two amendments alleged the following grounds:
1. One lawyer represented two defendants (no adverse interest was alleged).
2. The systematic exclusion from the mercy trial jury of persons opposed to the death penalty and death sentence is cruel and unusual punishment.
3. Pleas of guilty were based upon confessions coerced by the police.
4. Ineffective assistance of court-appointed counsel.
5. The State knowingly withheld evidence favorable to the petitioners.
6. Innocence, on the basis that one Curtis Adams had confessed and that the mercy trial testimony of Willie Mae Lee and of the two petitioners was perjured.
The allegations and proofs were totally insufficient on grounds 1 and 2. As to ground 1, no adverse interest was alleged or proven. As to ground 2, there was no voir dire transcript in the record but counsel gave an oral "stipulation" accompanied by an oral explanation and exceptions. From the explanation it appears that the court, possibly without motion of counsel, excused five veniremen after examining them with respect to their opposition to the death penalty, and the State had in excess of five peremptory challenges left at the time the jury was accepted. There is no clear showing that the court in its voir dire examination departed from the requirements of Section 932.20, Florida Statutes, F.S.A.,[1] which has been the law of Florida for over 100 years. That part of the judgment which denied relief on these grounds is affirmed.
At the conclusion of the lengthy hearing held on the motion to vacate, the trial judge found that the quantum of proof required of the petitioners was that which is sufficient to raise a reasonable doubt as to the validity of the prior proceedings. Using this standard he found for the petitioners on the issues of (1) innocence, and (2) the State knowingly or negligently withholding evidence favorable to defendants. On all other issues he found for the State. However, the trial judge found that the confessions were not coerced but the guilty pleas "may" have been.
The State appealed and the appellees filed cross assignments of error so that virtually all possible issues are now before this Court.
The State's first point was whether the trial judge erred as a matter of law with respect to the burden of proof applicable in a collateral proceeding pursuant to Criminal Procedure Rule 1.850. We find that he did.
The trial judge in determining the test of the burden of proof cited two cases involving writs of error coram nobis. Criminal Procedure Rule 1.850 is now used to test the validity of proceedings which prior to the adoption of the rule could only be questioned by coram nobis. In both proceedings the procedure is somewhat similar. The petition for the writ of error coram nobis is first examined by a court, and *402 if the same alleges facts which, if true, constitute sufficient grounds for granting the writ, the lower court will be authorized to hold a hearing to inquire into the issues, and if the petitioner proves the truth of his allegations, the judgment should be set aside and the proceedings in the cause be taken up again at the point where the error in fact occurred.[2] Under rule 1.850 the trial court first examines the motion to vacate and if same alleges proper grounds cognizable by this method of review and if the motion, files and record in the cause do not conclusively show that the prisoner is entitled to no relief it shall grant a hearing for the purpose of determining the truth of the allegations. If the court determines that the grounds have been proven, it shall vacate the judgment, discharge the prisoner, resentence him or grant a new trial. Judgments of a court of law are presumed to be valid; the burden on the movant is a heavy one to overcome this presumption. The judgment of conviction will not be reversed except upon a clear showing of a departure from the essential requirements of the law.[3] It is incumbent upon one collaterally attacking a judgment to prove his allegations.[4]
We hold that the test used by the trial judge for determining the quantum of proof was error. Nevertheless, if the conclusions reached by the trial judge are correct when measured by the proper burden of proof, his findings and judgment should be affirmed.
We must consider the record developed in the collateral attack proceedings prior to evaluating the other grounds of appellees' motion. At the hearing held in 1968, five years after the mercy trial, the trial judge was careful to include all matters brought before him in the record. This voluminous record includes all exhibits, all depositions and all transcripts from the Grand Jury proceedings through the full hearing on the motion with the exception of the transcript of the mercy trial. This transcript had been borrowed from the Supreme Court and was part of the evidence before the trial judge at the hearing on the motion. We have likewise borrowed the transcript and have considered it together with the full record.
This full record reflects the following facts. On Thursday, August 1, 1963, about 4:30 a.m., the Gulf County Sheriff's office received a report that the Mo Jo Service Station was open but the two attendants, the money from the cash register, a paycheck cashed by Freddie Lee Pitts earlier, and a .38 caliber Smith and Wesson were gone; the soft drink machine was open but the money was not gone; and there were no signs of a struggle. The Sheriff's office proceeded on the theory that the attendants had gotten drunk and wandered off, taking the money with them.
It was established that the disappearance occurred after one of the attendants received a telephone call about 2:15 a.m. It was also established that there were several vehicles and about a dozen people at the station about midnight. Among these were a white woman, two white men and two young men getting gas in a drum on the back of a truck. There was one car containing Wilbert Lee, his wife Ella Mae Lee, his sister-in-law Dorothy Martin, Freddie Lee Pitts, Willie Mae Lee and Roland Lee Jones, all Negroes. Wilbert Lee made a telephone call while the Negro women complained about being refused the use of the restroom. After leaving the station, this group went to Wilbert Lee's house where, joined by three soldiers including Lambson Smith and one woman, they drank beer and moonshine whiskey *403 until about 2:00 a.m. Several of this group described their midnight visit to the service station to the authorities.
Townsend, a polygraph operator, arrived at the Port St. Joe jail about noon the next day (Friday, August 2, 1963) for the purpose of making exploratory tests in what was represented to him to be a missing persons case. Because of factual differences in their statements, Pitts, Lee and several others were advised of their rights and asked to take the lie detector tests. They agreed. Wilbert Lee was tested first. Townsend deposed that Lee's test reflected deception. Pitts was tested next. He informed Townsend that he and Lee had returned to the Mo Jo Station later, Lee had robbed the attendants, and then they drove away leaving the attendants alive. This was the first information the Sheriff's office had concerning a robbery. Pitts's test was concluded about 7:40 p.m. and Lambson Smith was tested next. He told Townsend that on August 1st Pitts, Lee and one of the Lee women left Lee's house about 2:00 a.m. and returned two or three hours later. His test showed no deception. Because of the poor condition of the Gulf County jail, Pitts and Lee were taken by Deputy Sheriff Wayne White in a car driven by Bob Sidwell (radio station owner) to the Bay County jail in Panama City. The jail records reflect their admission at 10:30 p.m. Meanwhile, the polygraph operator worked through the night testing Ella Mae Lee, Willie Mae Lee, and Roland Lee Jones. Ella Mae while being tested changed her original story and admitted that her husband left the house with Pitts and Willie Mae.
On Saturday, August 3, 1963, about 8:00 a.m., two women while fishing found the maggot-infested and deteriorated bodies of the two attendants who had been shot in the head. Ella Mae Lee, Roland Lee Jones, and Dorothy Martin either by written or oral statements said that it was Pitts, Lambson Smith and Willie Mae Lee who had left the Lee home at 2:00 a.m. for two or three hours on August 1st, and that Wilbert Lee was in bed with his wife during their absence. Because Willie Mae Lee had admitted being an unwilling witness to the robbery and abduction and had described the crime fully but had confirmed that the culprits were Pitts and Smith, Wilbert Lee and his wife Ella Mae were released from the Bay County jail at 11:00 p.m. on Saturday, August 3, and driven home. Ella Mae testified later that before her release Willie Mae was crying in the jail dining room because she had lied when she said Smith was involved. Willie Mae testified that she had been placed in a cell with Ella Mae who had forced her to lie for Wilbert Lee by accusing Smith.
Over the weekend the polygraph operator went home, and Deputy White who had been assigned to the case was pulled off to assist with a Wewahitchka jailbreak. There were only two deputies in Gulf County. At some unknown time Bay County Deputy Kittrell talked with the man who said he had slept in the bed with Wilbert Lee's wife on the night of the murder, thus impeaching Wilbert Lee's alibi.
On Monday, August 5, Willie Mae was given another polygraph test and changed her story as to Smith. Pitts and Smith were also tested again. The minor, R.M.T., talked to the officers and told who slept with whom. Wilbert Lee was then arrested on Tuesday, August 6. Lee's wife was picked up, and she also changed her story, admitting that her husband did not spend the night at home.
Circuit Judge Fitzpatrick testified that when he learned that Pitts and Lee were charged by warrant with this crime, he requested that they be immediately carried before the County Judge in Wewahitchka, and he appointed Attorney Gaskin to represent them at arraignment only, which occurred on August 7, 1963. Gaskin as a matter of course pleaded them not guilty. At that time he observed the defendants and testified:
"They didn't appear to have been beaten. I did not undress them, I did not run *404 my fingers through their hair. I made an observation and discussed with them, just asked the question if they had been treated properly. To which they replied that  I believe, if I recall, they said of course they didn't like the jail, but other than that they had not been mistreated."
County Judge Husband testified that he observed nothing unusual, no bruises or evidence of mistreatment about the defendants.
Judge Fitzpatrick testified that during his several years experience as a city judge in Pensacola and as United States Commissioner for four years of trial jurisdiction he had seen police brutality, and he knew that the presence of an officer tends to make an accused less responsive, so he had the accused carried into his chambers. He observed them and saw no evidence of physical beating or abuse. He testified:
"I sent everyone from my chambers other than these two Defendants, asked them if they had been mistreated in any way. They said they had not. I asked them if they had counsel, they said they did not. If they desired to have counsel, they said they did. And I asked them with reference to their feeling about being taken to the Bay County jail rather than Gulf County. And I explained to them that we had deplorable conditions in our Gulf County jail, which we did, and which had been condemned by the state prison officials. And my recollection is that each of them requested that they be permitted to stay in the Bay County jail.
"I asked them if they had  at that point everyone else was reassembled  and I asked them if they had any preference as to counsel. They said they did not. As I recall, they said they didn't even know any lawyers in this circuit. I asked them if Fred Turner would be satisfactory with them. A few days prior to that time Mr. Turner was a national hero. He had freed Gideon.
* * * * * *
"* * * He was outstanding criminal counsel and I thought I was giving them what, in my opinion, was the best criminal attorney in this circuit.
"* * * I told them that I could not be sure that he would be in a position to represent them. * * * Mr. Turner was contacted and accepted the appointment."
After arraignment the officers brought Willie Mae and Lee together. When Lee heard Willie Mae's story, he confessed orally. When Pitts was then brought in to confront the other two, he also confessed orally.
On Thursday, August 8, 1963, at 3:00 p.m., Pitts signed a written statement giving the details of the crime but sticking to his original story that it was Lee and Willie Mae who committed the crime and he was just in the car. The evening at 7:00 p.m., Willie Mae signed a full written statement, and at 1:30 a.m. Lee signed a written confession.
Pitts, Smith and the other three men who were at Wilbert Lee's house from about midnight until dawn on August 1, 1963, were in the Army and were on maneuvers near Port St. Joe at the time. The Army was interested in the case, had investigated at the camp but found nothing incriminating. After several prior unsuccessful attempts to see Pitts while he was in jail, CID agents Potts and Hoag did see and talk to him on the afternoon or evening of August 8. Pitts told them that he had confessed because he had been beaten. Captain Thomas Arata was in the jail at the time, and he was called in to see Pitts. Captain Arata testified that Pitts looked tired and had two or three bumps or "hickeys" on his head but no lacerations, and he speculated that the bumps could have been from natural causes, birth deformity or from a lick on the head. He did not recall seeing any swelling about the face. CID investigators Potts and Hoag testified that Pitts looked "very tired, like he was *405 in pain", complained that his jaw was swollen, told them he had been beaten, asked them to feel the bumps on his head, and to see if they could tell what was wrong with his eyes which were bloodshot. The Army men did not report the alleged beating to the jail officials.
Sheriff Daffin was asked if Pitts or Lee ever requested a lawyer during the course of his interrogating them, and he deposed that they asked him to contact Timothy Youngblood, head of the local NAACP, which he did; but Youngblood, who was not an attorney, said he had already checked on the defendants and didn't want to have anything to do with them. Attorney Turner deposed that prior to his appointment he saw Pitts in the dining area of the jail and Pitts asked him to tell Timothy Youngblood to come to see him. This Turner did.
On the night Turner was appointed he visited the defendants in jail and advised them that he had accepted the appointment. They were in separate cells. He asked if they had been mistreated in any way and they said, "No." He told them he would be back the next day. The following day he returned, asked Sheriff Daffin for copies of statements which he had and received same. Turner deposed that the first statements he read indicated that "both Pitts and Lee did not have any knowledge of the death of these two men." He received "a number of statements" including Willie Mae Lee's and that of Lee's wife. Turner had a dictaphone for the purpose of getting names and places for alibi purposes, and he made a recording of his interview with the two defendants. He again asked them if they had been mistreated, and again they answered in the negative. Pitts first told Turner that he had nothing to do with the murder of the two attendants. Lee didn't say much. Turner then read to them Willie Mae's statement which recited in great detail how she had been taken to the service station by Pitts and Lee who had forcibly abducted the two attendants and killed them, and how they had threatened to kill her baby if she talked. Pitts said he would like to see Willie Mae face-to-face, so Turner went to the door and asked a deputy to bring her in. (Willie Mae had requested that she be kept in jail for protection.) Turner deposed that Pitts accused Willie Mae of lying, and she maintained that her statement was the truth. They reviewed her statement and she left the room. Lee finally agreed that it was the truth and told Pitts, "If we're going to get any help anywhere, we'd better tell this man the truth." Turner's notes reflected that the three told him the same story  that Pitts knew there was money at the Mo Jo Station because he had cashed his paycheck there earlier; that he stole the pistol from the station when the six were there together shortly before midnight; that he, Lee and Willie Mae left the Lee home to go get vodka; that Pitts drove back to the Mo Jo, put the two attendants in the car, drove to the woods, and the two men took the attendants into the woods and shot them. Willie Mae who had been left in the car tried to get away by walking down the road to flag a passing car, but when Lee and Pitts returned, Pitts threatened to kill her child if she talked. The notes contained details of how one of the attendants was tied, their begging for mercy, etc., the fact that Pitts wanted the money to send his girl friend to New Orleans and Lee got none of it. Turner further deposed that during the above interview there were only the three or four of them together, but at one point he decided to take a break, ordered coffee for the group, and the Sheriff came in and chatted with them. After Willie Mae and the Sheriff left, Turner then discussed with Pitts and Lee the probabilities of going to trial, how they could "shake" Willie Mae's testimony, if her testimony could be assuaged with other testimony of an alibi, the number of people that put them at the scene, the fact that the Sheriff had pictures of the two dead men with maggots in their heads, the fact that the indictment was defective, the probabilities of a plea of guilty, the trial judge's *406 background and experience, the fact that he had six daughters, etc. Pitts asked if there was a possibility they could get a jury trial on the question of mercy, and Turner promised to make a special request for same. When discussing the fact that the gun had not been found, Pitts told Turner that when he got back to camp, he ran out in the sand dunes far enough that he couldn't see any lights and threw the gun as far as he could.
Turner discussed with the State Attorney the possibility of a plea to a lesser offense. The offer was rejected. The State Attorney did agree not to introduce the pictures of the bodies if the defendants pleaded guilty. Turner then talked to the judge about the possibility of a mercy trial, and was promised one if the defendants chose to plead guilty. When he reported this to Pitts and Lee, they told him they had decided to plead guilty. Turner deposed that he did not suggest how they should plead, that decision was up to them, but he talked to the defendants several times before the guilty pleas were entered. Turner was asked if any officers were ever present in any of these conferences, and he replied, "I can say this with all the accuracy in the world. At no time did I discuss this case with them in the presence of any other law enforcement officer, of which I'm aware of right now. I don't recall any time. Now, when  when I would interview those people, the sheriff and the deputy sheriff would be in the jail, and sometimes we'd take a break when we'd talk over there, and we'd go out and get coffee and the officers would be around there. But we were not discussing this case." When asked the question: "Prior to entering the plea of guilty, did there ever come a time when Sheriff Daffin interrogated Pitts and Lee separately at the Bay County jail, in your presence?", Turner answered, "No, sir."
The indictments were quashed, and the Grand Jury returned new indictments. Pitts and Lee were rearraigned on August 17 before Judge Fitzpatrick, and entered their pleas of guilty. Judge Fitzpatrick testified that he had the defendants before him several times; that each time he asked them if they had been mistreated and if they were satisfied with the services of their attorney. The transcript of the arraignment confirms his statement.
The mercy trial was held on August 28, 1963, in Wewahitchka. Attorney Marion Knight was at the court house, walked over to the defendants prior to the trial, and said:
"* * * `What are you boys pleading guilty to first degree murder for? I never heard such a thing. You're jumping in the electric chair and pulling your switch. If you were beat into a confession or tricked into a confession or talked into a confession, you've got one of the best lawyers in West Florida there representing you, and he'll find it out. But if you plead guilty you leave him no chance.' And the one on the other side spoke up and says, `We ain't been talked into nothing, we ain't been beat into nothing, we ain't been scared into nothing. We told it just like it was. And we're going to do it again.' And the one on this side says, `I ain't been talked into nothing. I told the truth about it and the sooner it's over with the better I'll like it.'"
Knight then asked Turner why he was pleading them guilty, and Turner told him he couldn't help it; they "had confessed to everybody that would let them."
Core, Clerk of the Circuit Court, testified that during one of the trial recesses one of the defendants said, "Mr. Core, I don't know why we did this." Core further said: "It was my thinking that they meant that they were guilty, because they had already told us so several times before this."
The defendants testified freely at the mercy trial, and prior to sentencing again denied they had been mistreated. Thus, at the time of the mercy trial neither of the defendants had ever complained of any *407 mistreatment by police officers except the complaints Pitts made to the Army CID agents. On the contrary, on numerous occasions when asked by court officials and by their own attorney if they had received any mistreatment, they denied same.
On October 29, 1963, FBI agents interviewed both Pitts and Lee in Raiford. Pitts told them he was beaten to the point that he lost consciousness by Deputy Kittrell after he took his first polygraph test and before he was taken to Panama City. Lee told them that during the ride to Panama City, Pitts didn't complain about having been beaten, and he didn't observe any bumps, blood or swelling on Pitts that would indicate he had been beaten. Lee told the FBI agents that on August 9, 1963, he was hit with a blackjack three or four times, and he thereafter confessed.
On June 23, 1964, Turner received a letter from George B. Smith, Suite 2030, 10 Columbus Circle, New York, N.Y., requesting to borrow a copy of the transcript of the record and other papers. Turner sent him his entire file, including witnesses' statements and statements of defendants. Thereafter Turner was notified on August 13, 1964, by a Mr. Ronald R. Davenport of the NAACP Legal Defense and Educational Fund, 10 Columbus Circle, New York, N.Y., that his file had been sent to a Mr. LaFore of the Non-Partison Voters League of Mobile and Mobile County who would return the file when he was through with it. Turner never recovered it. Sometime after the appeal was filed in the Supreme Court, Turner had an informal chat with one Charles or Bill Karo and Tullis B. Easterling of the FBI who wanted to know if there were any bruises or marks on the defendants when Turner saw them or if they complained of being mistreated. Thereafter Turner received a telephone call from Fort Rucker, Alabama, from a Florida attorney (Orlando), a First Lieutenant reserve officer on active duty, who asked Turner if he observed any bruises or other indication of mistreatment of the defendants. Turner told him he had not. The officer asked if he had a recording of the conversation with them and would he send the tape to Fort Rucker. This Turner did, and the tape was never returned. Sometime later Tobias Simon of Miami asked for a transcript and copies of statements, and Turner sent him copies of all his correspondence so Simon could trace and obtain them. Thus Turner was stripped of the statements he had and the tape of his initial interview with the appellees.
Deputy White deposed that a colonel from CID made a trip to Gulf County and apologized for the actions of Potts and Hoag.
At the hearing on the motion Pitts testified at length about how Deputies Kittrell and White took him for a ride after he finished his first polygraph test (when he admitted involvement in the robbery) and before he was taken to Panama City. He stated he was knocked out and unconscious on several occasions and that Deputy Kittrell was the one who administered the blows. His testimony is in direct conflict with the testimony of the two men who took him to Panama City and in conflict with the testimony of the three officers who took him on the trip to look for the bodies; Kittrell was a deputy with the Bay County Sheriff's office and was not involved with the case nor was he in Gulf County prior to the time Pitts was taken to Panama City. The alleged beating Pitts complains of occurred six days prior to his confession.
In his testimony Lee said that on the night after arraignment (10 days before he pleaded guilty) he was hit a couple of times and was told that they would shave his wife's head and execute her if he didn't talk. He said they then brought in Willie Mae and thereafetr he said what they told him to say; it was typed up and he signed it. When asked who beat him, he said he didn't know the man's name, though he did know White, Barron and Daffin by name. His signed statement *408 reflects that Daffin, Barron and Mrs. Smith were present.
The petition alleged that one Curtis (Boo) Adams, Jr., had committed the crime. The record reflects Adams's life history related below in chronological sequence. Adams had lived in Port St. Joe since he was 7 or 8 years old. He had fished or hunted in the area where the bodies were found and knew it well. He had known Skipper, owner of the Mo Jo Station, for 15 or 16 years. He had been a friend to Floyd since 1962; they used to go out drinking together. Since the early 1950s Adams had known Burkett who was a close friend of Adams's father. Adams was convicted of a Panama City armed robbery in 1956. While in prison he met Mary Jean Akins, the wife of an inmate. When he was paroled in 1962, he returned to Port St. Joe where he began living with Mrs. Akins. On the morning of August 1, 1963, he and Mrs. Akins quit their jobs, got their paychecks and left town. They went to the Broward County area where Adams obtained a job and lived for the first week or two in a trailer with friends. On August 16, 1963, they needed money because Adams had not yet received a paycheck so on that night he robbed a service station, took the attendant, McFarland, to a wooded area and killed him in much the same manner as the Mo Jo murders occurred. Adams and Mrs. Akins lived in that area for 3 or 4 months and then returned to Port St. Joe to visit his family and also to visit her family in Perry. Mrs. Akins was pregnant at the time. They apparently stayed in North Florida for some time because he left Mrs. Akins in Perry and made a trip to Fort Lauderdale to rob the Avon Package Store. On December 2nd or 3rd, 1963, he robbed a supermarket in Perry. In April 1964 he was apprehended for robbing the Beneficial Finance Company in Key West. Adams's mother was very sick at the time and because Adams felt that he would never see her again, he requested and received permission to call Sheriff Parker of Gulf County. He told Parker that if he would have him returned to Gulf County so that he could see his mother, he would give him some information on the Mo Jo murders or tell him where the gun was located. The Sheriff knew Adams and his reputation and declined the offer. Adams was sent to Raiford where Pitts and Lee were incarcerated. By court order, Adams in January 1966 was returned to Broward County where he was given a polygraph examination, was interrogated, and admitted that he committed the Floyd-Burkett murders as well as the McFarland murder.
At the 1968 hearing before Judge Holley, Adams was called as a witness. Accompanied by his own counsel he testified under oath that he did not commit the Burkett-Floyd murders. He admitted that sometime during the nighttime of July 31 or August 1, 1963, he stopped at the Mo Jo Station, went into the restroom, heard someone say, "Don't anybody move or I'll shoot", looked out the door and saw Pitts and another man taking Burkett and Floyd off. When he talked to Sheriff Parker from Key West, that was the first time he knew of two men being on death row. (He was not asked nor did he testify as to whether he learned the particulars of the crime and the fate of his friend, Floyd, when he returned to Gulf County in late 1963.) He testified that he confessed to the Burkett-Floyd murders while he was in Broward County jail because sixteen Negroes threatened him, hung him on bars and beat him. He further testified that he knew Pitts and Lee from having seen them on the streets and in prison, but he had never talked to them. At that time Adams was serving a life sentence for the Broward County murder and other sentences totaling 40 years.
Appellees in their collateral attack rely heavily upon Adams's 1966 tape-recorded confession for the purpose of impeaching his court testimony, and as evidence of the issue of innocence. The Broward County tape was introduced in evidence after polygraph expert, Homes, who conducted *409 the examination, testified that he believed Adams was telling the truth. In the tape Adams stated that he left his apartment between 1:30 or 2:00 to rob the Mo Jo Station. He told the attendant to fill his car with gas and when a car with two Negro men and three women drove up, he went to the restroom. He heard loud talking and arguing. When he thought they had left, he looked out and saw a soldier drive up and go to the public telephone; the next time he looked out he saw a truck with two 55-gallon drums on it which were being filled with gas; when he looked out again he saw the car with the colored people was still there. When he next tried to get out, the restroom door was locked from the other side. Burkett unlocked the door and told him that the colored people were trying to use the restrooms. Adams related in detail how he then robbed the station, forced one of the men to drive, and how he shot them. (At this point, it is noted that the arrival of the car of Negroes, their argument over the use of the restrooms, and the presence of the truck and the filling of the drums with gas, were all events which a number of witnesses testified happened about midnight  2 hours before Burkett received a telephone call from a friend.) The tape recording of this interrogation gives an insight into Adams' philosophy. When asked about someone being sent to the electric chair for something he didn't do, Adams replied, "I never worried about dying * * * Everybody's days are numbered, so it don't matter what you do or what; you're not going to prolong it or you're not going to rush it."
Mary Jean Akins told authorities how Adams had told her about the Mo Jo robbery and murders, what he had brought home, and how it bothered him for a time. Prior to the 1968 hearing she was taken to a polygraph expert in New York City. There she changed her story; but when she returned, she reverted again to her original account.
The testimony of Mrs. Akins when considered with Adams's tape recording contains detailed descriptions only slightly less vivid than the composite story told at the mercy trial which related the conversation the abductors had with their victims during the 12-mile ride to the scene of the murder, Pitts's reasons for wanting the money, etc.
The facts in this case would not be complete without some mention of pressures put upon Willie Mae Lee who was a close friend to Wilbert Lee. According to her statements and testimony immediately after the murders Wilbert Lee told Pitts, "I told you we ought not to leave no damn witnesses." She begged them not to harm her and Pitts threatened her life and that of her child if she talked. While in jail Ella Mae Lee attempted to choke her and forced her to say that Wilbert Lee was not involved. At her own request for protection she was kept in jail from August 3, 1963, until after the mercy trial. Thereafter she left town for a period of time. Prior to the hearing on the motion to vacate she again received some annoying messages. On several occasions Mr. Gene Miller or others representing him went to her home to see her. Her understanding of the purpose of these calls was that Gene Miller was trying to persuade her to change her testimony. Uncontradicted were her statements that Gene Miller, a member of the press, left his telephone number with her and information for getting in touch with a man in Panama City should she change her mind. In exchange Miller promised to get her a good job in Miami and put her little girl in a private school. She had also received censure from the Negro community due to her testimony. Immediately prior to the hearing on the motion she was told that if she testified at the hearing a black mob would be after her. She was so afraid for her life that she was again taken into protective custody.

Coercion of Confession or Plea
As to the issue of whether the pleas of guilty were motivated by a prior coerced *410 confession, the evidence reflects that the appellees, on numerous occasions after the alleged beatings took place, denied to the court, to their own attorney, and to others that they were mistreated in any way. The evidence further reflects that at the time they confessed, they were confronted by strong conclusive evidence against them independent of the confession  an eyewitness who knew them well and the testimony of the three women and four soldiers who remained at the Lee home and who knew the appellees and Willie Mae left the house together and were absent during the hours the murders were committed. Having carefully examined the facts, we find they support the trial court's finding that the confessions were not coerced.
We are not unaware of the United States Supreme Court cases in McMann v. Richardson and Parker v. North Carolina[5] which hold that a plea of guilty motivated by the strength of the State's case or by evidence independent of the confession cannot be set aside on collateral attack even if the confession is coerced and that a plea of guilty motivated by a coerced confession will not be set aside on collateral attack unless defendant was incompetently advised by his attorney. However, we did feel compelled to weigh the facts due to the allegations of incompetency of counsel.
Appellees in their motion to vacate do not claim that their pleas were coerced, and the evidence is devoid of any factual showing of any type of coercion which could effectuate an involuntary plea of guilty. In the collateral proceeding, under questioning by the court itself, both appellees testified that they pleaded guilty on advice of counsel. After some prodding including a suggestion that he pleaded guilty under fear for his wife, Lee finally answered in the affirmative but even then did not relate any factual circumstances that gave rise to that fear. The evidence reflects that the defendants knew that a plea of guilty would result in either a death or a life imprisonment sentence and that the pleas were made after a full assessment of the State's most damaging evidence and after they were unable to supply their attorney with any leads to establish a defense. Therefore, the trial court erred in finding that the "guilty pleas reasonably may have been the result of fear."

Incompetent Court-Appointed Counsel
Appellees' contention that their court-appointed counsel was incompetent is based upon their contention that Turner participated in a "police interrogation session in which counsel's clients give oral confessions, which * * * oral confessions are used against the clients at trial without objection"; that Turner did not obtain all of the unsigned statements given by witnesses although he knew the State's Attorney kept an open file; that he was unaware that the grand jury testimony had been transcribed to determine if perjury was committed there; that he was unaware that Pitts and Lee had been mistreated, that the U.S. Army CID made a parallel investigation, and that the defendants made written confessions to the police; and that Turner should have discovered exonerating and favorable evidence either by discovery procedures or by investigation. Turner deposed that he talked with a number of witnesses, that he visited the scene and that he discussed with the Sheriff the evidence he had. The Grand Jury testimony was not found to be perjured. Pitts knew about the CID investigation but did not inform his attorney. Prior to the investigation which Turner made defendants confessed to him.
Appellees' best point on this issue is their claim that Turner participated in a police interrogation wherein they gave up their *411 claim of innocence and confessed. The record is devoid of any evidence of a joint interrogation. Pitts on August 2, 1963, (the day after the murders) confessed to being present at the robbery which he blamed on Wilbert Lee. On August 5 Willie Mae told the authorities the full story, and the next day Lee was arrested. After arraignment, counsel having been appointed prior to that time, the officers brought Lee and Willie Mae together. When Lee heard Willie Mae's story, he confessed. Then Pitts was brought in, and he too admitted the events but claimed that the crime was committed by Willie Mae and Lee and he just drove the car which he had borrowed. This occurred on August 7, several days before Turner's appointment, and he was not present at that time. About August 16, 1963, Turner for the first time and at one of the defendant's request had Willie Mae brought into the room where he had been conferring alone with his two clients. While Willie Mae was in the room Turner interrupted his conference, turned off his tape recorder, and let the two defendants and Willie Mae talk among themselves. Turner listened. He was attempting to determine if there was any way they could "break" Willie Mae's testimony or could assuage it with other testimony of an alibi. Although there was some confusion as to the two separate occasions Willie Mae confronted the two defendants, it apparently was with relation to the Turner interview that Sheriff Daffin testified that the jail had no conference rooms, only two small offices, one of which Turner was then using; that he was in and out, and he overheard Willie Mae making statements to the effect that Pitts and Lee committed the murders and he overheard Wilbert Lee say, "Yeah, we did it." The Sheriff further testified, "[B]ut now that wasn't under Mr. Turner's questioning. That was when Willie Mae was telling them how the accident occurred." He further testified, "They had confessed several times before that * *" Willie Mae testified that only she, Turner and the two defendants were in the room. Turner said that after Willie Mae talked to Pitts and Lee the group had a coffee break and Sheriff Daffin joined them. Pitts and Lee may have confused their two confrontations with Willie Mae because they placed Doc Daffin in the room also. However, no one testified that Turner assisted in a police interrogation or that he and Sheriff Daffin jointly interrogated the accused until they confessed. Days before the first Turner interview the State not only had the eyewitness account which was corroborated in part by a witness who before dawn pushed Pitts's stalled car and by the many witnesses who knew that the two accused and Willie Mae were out together from 2:00 a.m. until about daybreak, but it also had Thomasina, the woman Pitts was planning to take to New Orleans and who had told authorities that Pitts had given her some money, had asked her to wash his bloodstained shirt, and had taken her with him to dispose of the gun or told her where he threw it.
On collateral attack the test of ineffective assistance of counsel is not any specified aptitude test in point of professional skill and it is not whether the attorney committed common mistakes of judgment, strategy, trial tactics or policy, but it is such a substandard level of services that the trial becomes a mockery and farcical.[6] Under the facts here, considering the strength of the State's case, the fact that defendants confessed to their attorney at their first real interview, that appellees have failed to show that there was any favorable evidence but on the contrary pleaded guilty, we find that the trial court was correct in finding that there was no showing of counsel's incompetency.

Withholding Evidence
On the issue of whether the State knowingly or negligently withheld evidence from the defendants in 1963, the appellees *412 contend that the prosecuting attorney had in his possession but did not reveal to counsel for the defendants the unsigned statements made by Willie Lee (accusing Pitts and Lambson Smith of the crime), unsigned statements by Ella Mae Lee, Dorothy Martin and Roland Jones to the effect that Wilbert Lee was home in bed with his wife, the fact that the testimony before the Grand Jury had been transcribed to determine if it were perjured, and certain oral statements. All the statements they complain of were those given during the early part of the investigation, while there was a concerted effort on the part of Wilbert Lee, his wife and friends to falsely accuse Lambson Smith of assisting Pitts in performing the crime instead of Lee. About the time of Turner's appointment, Pitts, Lee and Smith were carried before the Grand Jury, but only Pitts and Lee were indicted. Turner testified that he asked the Sheriff for his copies of the statements and received five including the two in which both Pitts and Lee claimed their innocence, Ella Mae's statement and one of Willie Mae's. Turner deposed that in the interest of the appellees he had sent the statements to the NAACP, and because they were never returned to him, he was at a great disadvantage when testifying as to what statements he had. He positively admitted that he did not have the statements above mentioned and that he did not ask the State Attorney to see his file. There was no finding of perjury at the Grand Jury hearing. Thus, the evidence appellees claim was suppressed was not only believed by the State to be untrue, the same having been repudiated and the reason for stating the untruths having been obtained, but it could have been useful to the defense only with reference to credibility, had Pitts and Lee pleaded not guilty.
Appellees rely primarily upon Brady v. Maryland[7] which held that suppression by the prosecution of evidence favorable to an accused after pretrial request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.
Here Pitts and Lee were tried before the Criminal Rules of Procedure authorized pretrial discovery and there is no constitutional right thereto.[8] Even in the absence of such a right the State Attorney, being an arm of the Court and charged with the duty of seeing justice done, is required to present to the jury at the trial all material facts known to him, favorable to the accused, and relative to the issues of innocence and punishment. The State Attorney may not deliberately hinder the defense in its investigation, knowingly present false evidence, or unfairly suppress exculpatory evidence. Both state and federal cases indicate that the State Attorney may, under certain circumstances not yet clearly defined, be required, in the interest of justice, to reveal to the defense, at the proper time, exculpatory evidence which is otherwise unobtainable by the accused, and upon request disclose "favorable" evidence. Even upon demand the prosecution is not required to comb its files for bits and pieces which conceivably could be favorable to the defense.[9] The United States Supreme Court has declined to determine whether the prosecutions' duty to voluntarily disclose extends to all evidence admissible and useful to the defense and what degree of prejudice must be shown to make necessary a new trial.[10] Appellees have failed to cite any case setting forth such standards. It is clear that even upon request failure to disclose is not grounds for a new trial in the absence of a showing of prejudice.[11] There is no showing of *413 prejudice here nor is there any showing that under the circumstances here related this is the type of evidence which is required to be revealed prior to trial rather than at trial, assuming that it could be classified as "favorable" to the defendants. Since the defendants chose to plead guilty and went to trial on the issue of punishment only, and since their testimony corroborated that of the State, the evidence here was clearly immaterial to the issue tried.
The trial judge erred in finding for the appellees on the issue of suppressing evidence.

Innocence
The issue of innocence has given this Court grave concern. The voluminous record, including the numerous depositions, has been carefully read, studied and analyzed. We have had fleeting qualms as to whether an otherwise voluntary plea of guilty may be collaterally attacked on the issue of innocence in the absence of allegations of facts indicating the plea itself was coerced,[12] but in view of the posture of the case as presented to this Court, the favorable decision of the trial court and the gravity of the claim, we have resolved to dispose of the issue on the basis of the facts without making any determination as to whether it has been properly raised.
The trial judge had before him the transcript of the mercy trial proceedings. Pitts and Lee testified under oath, in open court, in minute detail as to how they abducted the two service station attendants, the route they traveled, and the physical location of the site where the two men were shot. The transcript of Pitts and Lee's testimony at the mercy trial encompasses some 41 pages, so it is impractical to reproduce it in this opinion. Examples of their testimony is shown in the following excerpts. Lee's testimony: "Well, we got down there and the man repeated it again about if his hands wasn't tied, he'd kick us niggers' ass and he told him to shut up and so this other man told him, said, `Don't kill the other one because he has a family.' * * * When we got there Freddie told me to wham the hell out of them and I did what he said. I whammed the hell out of them." Pitts's testimony: "Slingshot got out of the car and he put the younger man  he put the younger guy in front * * * in the front seat and he got back in the car and I put Mr. Burkett in the middle and I got in and drove off and back up to the Kinney Road to White City along this road across the bridge at White City there and as we was driving along this younger guy said if he didn't have his hands tied he'd kick us two niggers' ass and I said, `We see who will kick whose ass,' and we drove on to this surfacing and I turned off there and we went down to the gate. At first I told the young guy to get out and he said, `How the hell am I going to get out? My hands are tied?' And then I got out and Slingshot got out and he handed me the gun and we took them on down this road after we had went through the gate and then I told Slingshot to hit them and he did and I shot them."
In this collateral attack proceeding the trial judge heard the testimony of "Boo" Adams, the key witness relied upon by Pitts and Lee. Adams testified without equivocation that he did not murder Burkett and Floyd. For the purpose of impeaching Adams's testimony in the instant proceeding, a tape recorded extra judicial confession made by Adams was presented to the trial judge, wherein Adams had proclaimed himself as the murderer of Burkett and Floyd. Adams's direct testimony in this proceeding was primary evidence. The impeachment testimony adduced was solely for that purpose and was not admissible for any other purpose. In order for the trial judge to have reached his finding of innocence, he necessarily had to find the following: 1. That Boo Adams *414 told the truth at his interrogation by the polygraph operator in Broward County; 2. That Boo Adams committed perjury when he testified before the trial judge in the collateral proceedings; 3. That Pitts and Lee committed perjury when they testified in open court during the mercy trial and upon the enumerated instances recited hereinabove; and finally, 4. That Willie Mae Lee perjured herself in every instance when she gave statements and testified in open court during the mercy trial and the instant proceedings. (It is noted that Willie Mae Lee from the outset placed herself and Pitts upon the scene where the murder was committed.) Obviously, such a finding by the trial court is wholly unsupported by the record.
We find that the trial court erred in finding for the appellees on the issue of innocence. By this decision we are not holding that the appellees are required on collateral attack to prove beyond a reasonable doubt that a third party committed the crime, but we are holding that a movant who has pleaded guilty, declining to resist the State's charge of guilt or proof thereof, must establish on collateral attack at least some clear showing by competent substantial evidence that there was a significant insufficiency in the State's evidence so as to warrant a new trial.

Cross Examination
At the hearing on the motion Willie Mae Lee was put in an hypnotic trance and again related or, in a manner of speaking, relived the events of the crime. The trial court had two psychiatrists examine the subject before and after she was put into the trance. They also observed the entire procedure and afterward testified as to their opinions of the technique, its effectiveness, the subject's response, etc. The appellees' objection was to a ruling of the court that only the hypnotist would do the questioning and that any questions the parties wished to ask must be submitted to the court. The appellees submitted no questions but contend that they were denied the right to cross examine. We find no reversible error in this procedure.
The judgment entered in this collateral proceeding is reversed as to those portions which found in favor of appellees Pitts and Lee; otherwise, the judgment is affirmed. The original judgments of guilty and the death sentences imposed upon Freddie Lee Pitts and Wilbert (Slingshot) Lee by the Circuit Court of the Fourteenth Judicial Circuit in and for Gulf County, Florida, respectively entered on August 17, 1963, and August 28, 1963, are reinstated.
Article V, Section 4(2), Constitution of the State of Florida, F.S.A. provides, inter alia: "Appeals from trial courts may be taken directly to the supreme court, as a matter of right, only from judgments imposing the death penalty. * * *" In the instant case, the judgment entered was one setting aside a death sentence. By our action, the death sentence has been reinstated. It is our view that such judgments should be appealable directly to the Supreme Court, for call it what you may, we have by direct appeal been saddled with the ominous burden of directly reviewing these death sentences. Pursuant to the provision of Article V, Section 4(2), Constitution of the State of Florida, we hereby certify that this cause involves a question of great public interest.
Reversed in part, affirmed in part.
JOHNSON, C.J., and SPECTOR, J., concur.
NOTES
[1] See Barlow v. State, 238 So.2d 602 (Fla. 1970).
[2] Chambers v. State, 117 Fla. 642, 158 So. 153 (1934); and Russ v. State, 95 So.2d 594 (Fla. 1957).
[3] Coleman v. State, 193 So.2d 699 (Fla. App.1st 1967); and Harris v. State, 177 So.2d 543 (Fla.App.3d 1965).
[4] Paul v. State, 177 So.2d 537 (Fla.App.3d 1965).
[5] McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), and Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970).
[6] Gillyard v. State, 175 So.2d 798 (Fla.App.3d 1965).
[7] Brady v. Maryland, 373 U.S. 83, 89, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[8] State v. Gillespie, 227 So.2d 550 (Fla. App.2d 1969).
[9] Ibid.
[10] Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737, 744 (1966).
[11] Ibid, and Brady v. Maryland, supra.
[12] Steinhauser v. State, 228 So.2d 446 (Fla.App.2d 1969).