287 So.2d 24 (1973)
Errol RESNICK, Appellant,
v.
STATE of Florida, Appellee.
No. 42467.
Supreme Court of Florida.
November 7, 1973.
Rehearing Denied January 14, 1974.
*25 John Paul Howard, Jacksonville, for appellant.
Robert L. Shevin, Atty. Gen. and A.S. Johnston, Asst. Atty. Gen., for appellee.
DEKLE, Justice.
The defendant was convicted of murder in the first degree without recommendation of mercy in the Circuit Court in and for Pinellas County. Subsequently, under authority of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), this Court in Anderson et al. v. State, 267 So.2d 8 (Fla. 1972), reduced the defendant's sentence from death to life imprisonment. We now consider his remaining grounds urged for reversal.
The defendant was indicted by the Orange County Grand Jury on a charge of first degree murder. By the Statement of Particulars, the State charged the defendant as a principal under Fla. Stat. § 776.011 F.S.A. (1972), and alleged that the defendant had hired David Hicks a/k/a "Preacher" and William Brunson to kill Eugene Walker, whom they suspected of being a police undercover agent. (In fact he was.) On October 7, 1971, a motion for a change of venue was granted and the case was transferred to the Pinellas County Circuit Court.
For the sake of brevity, most of the facts will be discussed in conjunction with the defendant's fourth point on appeal, which involves the admissibility of evidence under the "co-conspirator rule." Under the "co-conspirator rule" all the acts and declarations of the members of a conspiracy constitute the acts and declarations of, and are therefore admissible against, each of them.[1] Before invoking the rule, however, independent evidence of the existence of a conspiracy, and of the objecting party's participation in it must be presented by the State.[2]
*26 It is the contention of the defendant that the State has failed to prove that a conspiracy to murder Walker in which he participated existed and therefore the admission of certain hearsay testimony was prejudicial error. In particular, the defendant urges as error the admission of the testimony of Brunson to the effect that after going to a motel room at the defendant's direction he met Preacher and was told by Preacher that "we [are] going to `hit' Walker." We find no error in this.
First, as the State points out, there is sufficient independent circumstantial evidence upon which it may be concluded that a conspiracy to murder Walker existed. It is not necessary that the conspiracy be proved only by direct evidence, any more than in other matters, for it is clear that participation in a criminal conspiracy may be shown by circumstantial evidence.[3]
In early August, 1971, as testified to by Greg Lyell, a meeting took place at the ABC Bar in Orlando between Lyell, Brunson and the defendant. At that meeting the defendant discussed the possibility of a "leak" in his organization and asked Lyell if he could find out who it was. Lyell testified further that the defendant thought the leak might have been Walker or another man referred to only as "Bob". Lyell also testified that he had been sent to Washington, D.C., by the defendant for the purpose of committing a robbery and while there saw Preacher.
The next witness to testify was Brunson. Brunson's testimony corroborated Lyell's testimony as to the meeting at the ABC Bar and the trip to Washington, D.C. Brunson also testified that the defendant stated that if the leak proved true, "the man had to be wasted." The defendant also told Brunson and Lyell that he had a way of checking to see if Walker was the leak. According to the defendant, Walker was supposed to have killed a pilot and the way to find out if he was the leak was to have him dig up the pilot; "if he didn't he would know he was lying and therefore he was the leak and to leave him in the same boat... ."  apparently meaning the same "boat" as the pilot. Brunson also testified that the defendant asked Lyell if he had any objections to killing Walker because they were friends, to which Lyell replied that he did not.
Finally, Brunson testified that the defendant told him he had a "strongman" that would help Brunson and Lyell steal a $1,000,000 coin collection from a coin collector's convention being held in Washington, D.C. Following a telephone conversation between Brunson and the defendant in Washington, D.C., Brunson met the apparent "strongman", Preacher.
The robbery in Washington, D.C., did not take place, according to Brunson, because Preacher left for New Orleans and Lyell and Brunson were told by the defendant to return to Orlando. Upon arriving in Orlando the day before the killing, Brunson called the defendant and was told to meet him at a corner. Brunson met the defendant, they drove to a restaurant where the defendant borrowed Brunson's car and upon his return told him to go to Room 224 at a motel. Upon arriving at this room Brunson found Preacher in it. Preacher told Brunson (and it is this testimony which defendant objects to as hearsay) that they "were to hit Walker." *27 This was merely the confirmation, the fulfillment, of the earlier conspiracy determining to do so which is based upon direct conversations and plans of the defendant. The "condition" upon which the conspiracy to kill Walker was based  confirmation of defendant's suspicion of Walker as the "leak"  was resolved; the act thereupon followed, based upon defendant's determination that Walker be "wasted" if the suspicion proved true.
Preacher and Brunson remained at the motel until they received a call from defendant the night before Walker was killed, instructing them to go to Frisch's Big Boy at 9:00 p.m. that evening and he would have Walker with him. They followed these instructions and about 9:00 p.m. the defendant arrived with Walker. Brunson thought he saw some police cars there and so Preacher and Brunson got in their car to leave. Their suspicions proved to be correct for as Agent Moniack of the Department of Law Enforcement testified he was at Frisch's and saw the defendant and Walker but did not know Brunson and Preacher.
Defendant came over to Preacher and Brunson in their car and asked if they "got a look at him"  "did they see Walker" and gave them a $50.00 bill for expenses. Preacher then told the defendant that he didn't like the place and Brunson suggested that they meet at a Waffle House. About 45 minutes later a meeting took place at the Waffle House between Brunson, Preacher, Walker and the defendant. At this meeting Walker was told he was to drive a truckload of coins, which, according to Brunson, did not exist. According to Brunson, Walker was told this so that they could get him alone. Brunson then told Walker he would call him at 8:00 the following morning.
The next morning, Brunson called Walker and agreed to meet him at the Waffle House at 12:00 noon. At approximately 11:30 a.m. Agent Moniack and several other agents met Walker at the Waffle House. After a short conversation in the men's room, Walker sat at a table by himself and the agents waited nearby. No one showed up and about 1:30 p.m. Walker left.
Brunson testified that he did not meet Walker because it was feared that "he was being watched." Later the same day, Brunson called Walker and asked him to be at the ABC Lounge in 10 or 15 minutes. The purpose for such short notice, according to Brunson, was to prevent anyone from following Walker. Brunson and Preacher met Walker around 5:30 p.m. and after a few drinks at the lounge and various other bars the three men went to an isolated junk yard. At this point, under the pretense of shooting Walker's pistol, they all got out of the car. While Walker was sitting on the right rear fender of the car, Preacher shot Walker to death. Walker's body was then placed in the trunk.
After having a few more drinks, Brunson and Preacher met the defendant at 11:00 p.m. at the Azalea Lounge. At this meeting the defendant asked them "how everything went". Brunson replied that Walker was dead. The defendant gave them $200.00 and told them to go to Miami. Brunson and Preacher departed, decided not to bury Walker, and headed for Tampa. En route, they took Walker out of the trunk and left him on the side of the road.
Upon arriving at Tampa, Brunson rented a room at the Old Orleans Motel and Preacher left for the airport. A few days later Brunson asked a girlfriend to call the defendant and ask him to pick him up. Brunson was later called by defendant and following their conversation the defendant drove to Tampa to pick up Brunson. As Brunson and the defendant were leaving the motel, they saw the motel's bellman and paid him for the room but the bellman could not corroborate the defendant's presence at the motel.
*28 Based upon this evidence we conclude that there was sufficient circumstantial evidence, constituting independent proof of a conspiracy to murder, and therefore the statement objected to, which Preacher made to Brunson in the motel room, was admissible against the defendant.
The defendant next contends that the suppression of certain evidence in the State's possession and known to the State is grounds for a new trial. The evidence in question came to the attention of the State on October 22, 1971, while taking a sworn statement from Lyell. During the statement Lyell stated that Brunson had told him that he, Brunson, was the one who killed Walker and not Preacher.
It is the defendant's position that this evidence should have been voluntarily disclosed by the State as it was the State's constitutional duty to provide any evidence favorable to the defendant. In particular it is argued that had this evidence been made known to the defendant, the credibility of Brunson, upon testifying that Preacher had killed Walker, may have been impeached to such an extent that the jury might have reached a different verdict.
It has been held that where suppression of evidence by the State is "deliberate,"  a considered decision to suppress or where the great value to the defense must have been known to the State  a new trial should be granted.[4]Sub judice there is no contention that the State suppressed this evidence after a considered decision. Nor do we find that this evidence was of such great value to the defense that the State should have divulged it.
The evidence in question is relevant only as to the credibility of Brunson, for under the facts here it does not matter whether Preacher or Brunson killed Walker; both men were hired by the defendant to do so. In fact, both did "participate" in a sense, for the two collaborated to lure Walker to his death. Both were equally implicated. Here, as in United States v. Miller, 411 F.2d 825 (2d Cir.1969), the credibility of Brunson was already greatly in question and as stated in Miller, supra:
"[N]egligent or even intentional failure of the prosecutor to disclose an additional item of impeaching evidence would not invariably require that a verdict be set aside."
It does not appear here that it would likely have caused a different result.
The defendant contends that the recent United States Supreme Court decision in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), is controlling. We do not think so. In Giglio, a witness for the prosecution testified that he was not given immunity for his testimony. In addition, the prosecuting attorney stated during summation that the witness had "received no promises that he would not be indicted." Because the witness was in fact given immunity, the deliberate suppression was found to be a violation of due process and the decision was reversed and remanded. In the case before us the deliberate suppression found to exist in Giglio is not present.
It is also error to suppress evidence where a motion to disclose is made by the defendant irrespective of the good faith or the bad faith of the State. Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In this case, however, no request to disclose this statement was made by the defendant.
We have completely and thoroughly considered the remaining issues presented by appellant. His points and authorities are not convincing and do not warrant discussion.
*29 Accordingly, the conviction and judgment, as previously modified by reduction of sentence, is affirmed.
It is so ordered.
BOYD and McCAIN, JJ., concur.
ROBERTS, J., concurs specially.
GROSSMAN, Circuit Judge, dissents with opinion.
CARLTON, C.J., and ERVIN, J., dissent and concur with GROSSMAN, Circuit Judge.
ROBERTS, Justice (concurring specially).
The evidence as to the guilt of the defendant is overwhelming. Even if there has been error in the trial, that alone is not sufficient to reverse the judgment of conviction. Section 59.041, Florida Statutes, F.S.A. entitled "Harmless error; effect." provides:
"No judgment shall be set aside or reversed, or new trial granted by any court of the state in any cause, civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence or for error as to any matter of pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire case it shall appear that the error complained of has resulted in a miscarriage of justice. This section shall be liberally construed."
and Section 924.33 entitled "When judgment not to be reversed or modified." provides:
"No judgment shall be reversed unless the appellate court is of the opinion, after an examination of all the appeal papers, that error was committed that injuriously affected the substantial rights of the appellant. It shall not be presumed that error injuriously affected the substantial rights of the appellant."
I agree with the following exposition by the District Court of Appeal, First District, in its most recent decision of State v. Young, 283 So.2d 58 opinion filed September 6, 1973:
"In any prosecution there are, of course, two parties involved; the State of Florida as the plaintiff and the person accused of crime as the defendant. They each stand before the Bar of Justice upon level ground. The defendant is entitled to a fair and an impartial trial. By the same token, the State of Florida, representing its citizenry, is likewise entitled to a fair and impartial trial. Neither the State of Florida nor any defendant may, within reason, expect to receive a perfect trial in any tribunal in which mortals preside. In nearly every adversary proceeding, some technical error may be found. Unless error reaches to and affects in a prejudicial manner the rights of a party to a fair and impartial trial, such error is harmless and does not infect the validity of the proceedings.
"One of the stated purposes of those who put together the fabric of the Constitution of the United States was to `establish justice' and insure `domestic tranquility'. [Emphasis supplied.] Such noble purposes were not reserved just to those accused of crime. They spread as a mantle of protection for the citizenry in general."
Accordingly, I concur in the opinion of Mr. Justice DEKLE.
R.P. GROSSMAN, Circuit Judge (dissenting).
There are two clearly distinct issues of significance before the Court in this appeal. The first involves the admissibility of certain evidence under the "co-conspirator rule". Certainly, it would be difficult to disagree with the analysis of this issue as presented in the detailed majority opinion. If one follows the careful tracing of facts and sagacious reasoning put forth in *30 that opinion, one cannot but agree with the conclusion that there was, in fact, sufficient circumstantial evidence, constituting independent proof of conspiracy to murder, and that the statements in question were admissible against the Defendant.
The second issue the Court must consider is that of the State's suppression of certain evidence regarding prior inconsistent statements made by the State's chief witness at trial, Travis Brunson. A re-examination of the facts relating to the proof of the conspiracy is only helpful insofar as it illustrates dramatically the role of Brunson in the trial  and, thus, the impact upon the Defendant's right of a fair trial of the suppression of evidence that would show that Brunson was definitely a liar and very possibly a killer. If we look again at the actual evidence that the majority has relied upon to establish the existence of a conspiracy, we must be struck by the way in which it focuses our attention on the Brunson testimony. Each major element of the conspiracy and indeed of the killing itself is based upon the uncorroborated testimony of Travis Brunson. It is Brunson's statements alone that connect Defendant Resnick with the Walker killing. Only Brunson testified that Resnick wanted action on any leak in the organization and that whoever proved to be the leak "had to be wasted." State Witness Greg Lyell, who was present at the same meeting with the Defendant and Brunson, had no memory of such comments. Only Brunson testified that the Defendant Resnick suggested a way of checking to see if Walker was the leak. When State Witness Lyell was questioned regarding a plan to find out who the leak was, he replied that there had been no such conversation, and that Resnick was not certain whether it was a boy named "Bob" or Walker. Only Brunson testified regarding the hearsay statement of "Preacher" (David Hicks) that Preacher and Brunson were to "hit Walker", impliedly on Resnick's orders. And, finally, only Brunson testified as to the actual details of the killing, telling an involved story in which victim, Walker, was taken by Brunson and Preacher for many hours of drinking and bar-hopping until they ended up in a lonely clay pit. Only Brunson told of how Preacher took Walker's own pistol and shot Walker right off the fender of the car in which the three men had driven out in the country. Only Brunson then testified to the final tie-in of the Defendant to the killing, stating that the Defendant Resnick met with Brunson and Preacher on the same day as the killing, and asked them "how everything went". Only Brunson stated that the Defendant gave Brunson and Preacher expense money to go to Miami.
Those are the facts upon which the majority relied in finding a conspiracy of murder that involved Defendant Resnick, and those are the facts upon which the State Attorney rested in his effort to convict the Defendant. Quite obviously, the primary duty of defense counsel was to impeach the testimony of Travis Brunson. Brunson was the only person who testified as to the killing, and was the sole testimony connecting Defendant Resnick with that killing. This case, and this appeal, are balanced on the shaky foundation of the credibility of the State's chief witness, Travis Brunson. And yet, when the State knowingly suppressed evidence that would have reflected directly on the credibility of Brunson, the majority of this Court finds no reversible error.
What exactly is known about the suppression of evidence? A few days before trial, the State's witness, Greg Lyell, gave a statement that was recorded before a court reporter, with the State's Attorney present. In that statement, Mr. Lyell stated that Travis Brunson had told him on numerous occasions that he, Brunson, had been the one that had killed Walker, and that, in fact, he had done it because he had discovered that Walker was "a rat" and he hated rats. The prosecutors were fully aware of this statement and even commented to Witness Lyell that they would just have to hope that he was not asked about the matter on the stand. Surely, *31 they had every reason to believe that this testimony would not come out at time of trial, or they would not have put Lyell, as well as Brunson, on the stand. The State utilized Lyell in its case-in-chief, while never asking any questions regarding Brunson's prior inconsistent story. The State then put Brunson on the stand, and literally proved its case with that single witness. After Brunson had testified as to how the killing occurred, the State asked no questions regarding prior inconsistent versions of that story. The State rested without ever having offered to the defense the highly helpful evidence regarding the contradictory story of the killing made by Brunson to Lyell. When the defense put on their case, two witnesses were offered. Both witnesses were police officers who testified solely regarding Brunson's reputation for truth and veracity in the community. The defense hammered away at the central theme of the case  Brunson's credibility. The defense never knew during the time that they were preparing for trial, nor during the trial itself, about the statement of Greg Lyell that would have undercut the credibility of the State's star witness.
There was no fact question regarding whether or not the evidence of Greg Lyell's statement was suppressed. The State's Attorney admitted his knowledge of the statement prior to trial, and acknowledged its inconsistency with the testimony the State knew Brunson would offer from the stand. The suppression is obvious; the suppression is improper. The suppression is not condoned by the majority. The issue that the Court considered was whether the unfortunate suppression was of such magnitude as to require the granting of a new trial. The majority feels it is not.
However, the majority opinion reflects the law only in part, and applies an inaccurate standard in evaluating the impact of the suppression on the Defendant's right to a fair trial. The standard utilized by the majority was: (a) whether the suppressed evidence was of "great value" to the defense, (b) whether the suppressed evidence was "deliberately" suppressed, and (c) whether the specific evidence had ever been requested by the defense. Even though these criteria are inadequate as a constitutional standard, it would seem that the Defendant has met even these. For instance, it would border on incredulity to contend that the suppression was not "deliberate". The prosecution could not have used both Greg Lyell and Travis Brunson as State's witnesses unless the statement was knowingly suppressed. Otherwise, the State would be in a position of offering two conflicting versions of the killing in its case-in-chief. In his summation to the jury, the State's Attorney traced in intricate detail the story of Travis Brunson. It was, in fact, his case. He could not have tried the case in the same fashion, nor thus argued the case to the jury had the conflicting stories of Brunson been presented fully. This leads us to another criteria advanced by the majority  that is, whether the suppressed evidence was of such great value to the defense that the State should have divulged it. The majority states that since "it does not appear here that it would likely have caused a different result in the jury verdict, the suppressed evidence was not of such significant value as to necessitate a new trial." Perhaps the most telling counterargument to that position is what happened in the later trial of Preacher (David Hicks). The statement of Lyell had been discovered prior to the Hicks trial, and the defense was able to center its trial preparation and defense before the jury on the conflicting stories of Brunson. Since the sworn statement of Lyell quoted Brunson as saying: "I snatched him out of the car by the hair of his head." I killed him "because I hated the rat," the Hicks jury was able to consider the possibility that Brunson had killed Walker on his own motivation without any orders to do so by anyone. The jury returned a verdict of not guilty for Hicks. This leaves the present appeal in the unusual posture of a conviction based upon a supposed order to Hicks to *32 kill Walker while Hicks himself has been exonerated of the crime. The "great value" to the defense of the use of a totally different version of the killing, quite possibly motivated solely by the State's star witness, is spelled out in capital letters by the not guilty verdict of the Hicks jury.
The final criteria put forth by the majority is that "no request to disclose this statement was made by the Defendant." The defense in this case had made all the regular discovery motions available to them under the then existing Florida Rules of Criminal Procedure. Ever since Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution has been constitutionally required to proffer to the defense material favorable to the preparation of that defense. In stating that the defense did not request this particular statement, the majority is ignoring the fact that evidence is suppressed by prosecution because the defense does not know about it and has no way of knowing about it. The defense could not have requested this specific statement of Greg Lyell, since it had no knowledge of its existence. As soon as the defense discovered the statement after the trial, specific requests certainly were made. Under the new Florida Rules of Criminal Procedure, that are presently in effect, 33 F.S.A. Rule 3.220(a), which outlines the prosecutor's obligation at trial, there would be no question that the prosecution would have had to make available to the defense "any material information within the State's possession or control which tends to negate the guilt of the accused as to the offense charged." A statement that could be interpreted as relieving Defendant Resnick of any and all responsibility for the killing of Walker certainly falls within the category of materials available to the defense under Rule 3.220.
But it is not only the new Rules of Criminal Procedure that put such a duty upon the prosecution. For instance, Canon 5 of the American Bar Association's Cannon's of Professional Ethics has long stated:
The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done. The suppression of facts, or secreting of witnesses capable of establishing the innocence of the accused is highly reprehensible.
It is not new law, but rather one of the most honored and basic propositions of the system of justice that our Constitution and our court will not tolerate trials in which the prosecutors have tipped the scales of justice against the Defendant. E.g., State v. Pitts, 241 So.2d 399 (1st D.C.A.Fla. 1970), cert. granted, 247 So.2d 53 (Fla. 1971); Case returned for new trial on the Attorney General's confession of error in the suppression of evidence:
Even in the absence of such a right the State Attorney, being an arm of the Court, and charged with the duty of seeing justice done, is required to present to the jury at the trial all material facts known to him, favorable to the accused, and relative to the issue, either of the innocence and punishment.
The standard to be applied in deciding whether or not suppression of evidence prejudices the Defendant to the degree that the granting of a new trial is required is a simple one. That standard can be summarized in two questions: What effect did the suppression have on the Defendant's ability to prepare for trial? Did an unfair trial result? To be even more concise, the standard might be summarized as  Does the defense rationally contend that the suppressed evidence was useful to it? If there is any doubt, whatsoever, that the testimony should have been divulged, "the prosecution is not to decide for the court what is admissible, or for the defense what is useful." Griffin v. United States, 87 U.S.App.D.C. 172, 183 F.2d 990, 993 (1950); Jackson v. Wainwright, 390 F.2d 288 (5th Cir.1968). In order for the Court to reject the defense contention that this material was useful to it and to declare the constitutional error of suppression as harmless, *33 the Court must be able to declare a belief that such suppression was harmless beyond and to the exclusion of any and all reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). If the suppressed evidence might have been useful in any fashion to the defense in leading a jury to entertain any reasonable doubts, the error cannot be harmless. Jackson v. Wainwright, supra; United States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971); Levin v. Clark, 133 U.S.App.D.C. 6, 408 F.2d 1209 (1967). It has been stated that even though favorable evidence is clearly not admissible at trial, its suppression is constitutionally impermissible if "it is useful" to the defense in its trial preparation. Giles v. Maryland, 386 U.S. 66, 98-99, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967) (Fortas, J., concurring).[1]
These examples of the types of suppression that have brought about new trials, *34 are based on the recognition by the courts of the reality of the criminal justice system. The courts know that there is an imbalance in the investigatory facilities available to the State and to the defense. Since the State has so many advantages in manpower, public support, and monetary resources, any condoning of the State's misusing its powerful position to suppress evidence favorable to the defense leads to an uninformed and poorly prepared defense, and consequently an unfair trial. The real harm in suppression is done before the trial, and it is to that period rather than to the trial itself and the highly speculative effect on the jury that the courts should look in deciding whether or not the suppression prejudiced the defendant. As the Fifth Circuit Court of Appeal stated in Ashley v. Texas, supra, in discussing the State's suppression of two psychiatric reports that would have shown the defendant to be insane:
We conclude that without any expression from the trial counsel that the fact of the opinions of Drs. Crowe and Tracktir, favorable to the defense is of such vital significance to the accused persons in planning and conducting their defense, the failure of the District Attorney to inform their counsel of this fact amounts to such fundamental unfairness in the trial of a criminal case as to amount to a denial of due process.
319 F.2d at 85. See also United States ex rel. Meers v. Wilkins, 326 F.2d 135 (2d Cir.1964).
The United States Supreme Court has examined the issue of suppression on a number of occasions in recent years. Again and again, the Court has decided that the trial should be a forum of truth, the full truth; the trial is not merely an arena for an effective conviction. In Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the Court was concerned with the use of perjured testimony in a trial which resulted in the conviction of murder of the defendant. One of the important witnesses for the State falsely testified that he had received no promise of consideration in return for his testimony, though, in fact, the Assistant State's Attorney had promised the witness consideration. The Assistant State's Attorney heard the false testimony and did nothing to correct it. The jury was apprised of other grounds for believing that the witness may have had an interest in testifying against the petitioner. However, the Court held:
The principle that a State may not knowingly use false evidence to obtain a tainted conviction is implicit in any concept of ordered liberty, and does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that the defendant's life and liberty may depend. As stated by the New York Court of Appeals in a case very similar to this one, People v. Savvides, 1 N.Y.2d 554, 557, 154 N.Y.S.2d 885, 887, 136 N.E.2d 853, 854-855:
It is of no consequence that the falsehood bore upon the witness' credibility, rather than directly upon the defendant's guilty. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth * * * that the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could, in any real sense be termed fair.
The silence of the State on as tangential a matter as whether or not a witness was being given consideration, brought about a reversal in Napue. The State's silence in the case at bar allowed the use by the State in their case-in-chief of two witnesses whose testimony would have been in direct conflict had the State offered the full truth rather than suppressing some portions of the truth.
*35 Actually, there is a rather astonishing parallel between the nature of the suppressed evidence in this case and the evidence that was involved in the landmark case of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In Brady, a statement of a co-defendant of Mr. Brady, named Boblit, was suppressed. Boblit swore, in a written statement, that he, himself, had killed the individual in question, although Brady had been instrumental in each step of the preparation, and in holding the victim during the murder itself. Even though the probable effect of such a statement would be only to theoretically help in a reduction of sentence, the Court held that the suppression of the codefendant's confession was a violation of the due process clause.
We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to the guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.
The principle of Mooney v. Holohan [294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791] is not punishment of society for the misdeeds of a prosecutor, but avoidance of an unfair trial to the accused. Society wins, not only when the guilty are convicted, but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly... . a prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his actions is not "the result of guile"... . Id. 373 U.S. at 87-88, 83 S.Ct. at 1196.
The principles of Napue and Brady were elaborated on during the last term of the United States Supreme Court in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). While appeal from a judgment of conviction of passing forged money orders was pending, defense counsel filed a motion for a new trial on the basis of newly discovered evidence. That evidence indicated that the government had failed to disclose an alleged promise to its key witness that he would not be prosecuted if he testified for the government. Much like the case at bar, the government's case had relied upon a single witness for almost all the essential elements of the offense. The suppressed evidence ran solely to that individual's credibility.
When the "reliability of a given witness may well be determinative of guilt or innocence," non-disclosure of evidence affecting credibility falls within the general rule (of Brady v. Maryland). Napue, supra, 360 U.S., at 269, 79 S.Ct. at 1177, 3 L.Ed.2d 1217. .. .
In the circumstances shown by this record, neither DiPaola's (the Assistant State Attorney) authority, nor his failure to inform his superiors or his associates is controlling. Moreover, whether the non-disclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity, and as such it is the spokesman for the Government... . Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and the evidence of an understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know it.
For these reasons, the due process requirements enunciated in Napue and the other cases cited earlier require a new trial, and the judgment of conviction is therefore reversed and the case is remanded for further proceedings consistent with this opinion.

Id. at 92 S.Ct. at 766. Emphasis supplied.
*36 The Supreme Court has not limited its holdings in this field to false testimony or totally suppressed testimony. It has held that a witness presented by the State who answers the literal truth in answer to every question, but still gives a false impression to the jury, may, through his testimony, give evidence that is in essence the suppression of the truth. E.g., Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957) (A husband was convicted of the murder of his wife. The unwritten rule is written in Texas. The wife's lover had discussed his affair with the wife in a manner that would lead one to believe that it was casual. Later, the lover admitted that it was anything but casual, and that the husband knew about its intensity. Even though the lover had stated the truth on the stand and had truthfully answered the questions put to him on cross-examination, the false impression created with the jury through the State's failure to volunteer the full truth of the affair resulted in a new trial.)
The law in this country no longer allows any doubts as to whether or not the State has an absolute duty to make available to the defense evidence of the nature of that suppressed in this case. A prior inconsistent statement regarding the method and perhaps the motivation of the killing of the victim in a murder trial by the State's star witness is of such obvious usefulness to the defense that it could have changed the entire character of the trial. It is hardly reasonable to contend that the existence of testimony regarding a prior statement of the State's chief witness that the witness himself committed the actual physical killing because "he hated the rat" is somehow not important to the defense of the case. By statute (F.S. §§ 90.09-90.10 F.S.A.), this state allows impeachment of one's own witness or of an adverse party by producing prior inconsistent statements. Both the Florida case law and the legal treatises agree that:
The theory of attack by prior inconsistent statements is not based on the assumption that the present testimony is false and the former statement is true, but rather the notion that talking one way on the stand and another way previously is blowing hot and cold and raises a doubt as to the truthfulness of both statements. Wingate v. New Deal Cab Company, 217 So.2d 612 (1st D.C.A.Fla. 1969), citing McCormack on Evidence, p. 63; see also Urga v. State, 104 So.2d 43 (2d D.C.A.Fla. 1958).
The entire question of prior contradictory statements, and their effect on the credibility of witnesses, and on the outcome of the trial, favors heavily the admission in full of the inconsistent statement. See Harris v. State of New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), in which the Supreme Court allowed the admission of the evidence of prior inconsistent statements made to the police of the accused for the purpose of impeaching his credibility, even though such statements were inadmissible to establish the prosecution's case-in-chief under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Accord Kiraly v. State, 212 So.2d 311 (3d D.C.A.Fla. 1968).
It is perhaps a sad comment on the times and on the practices of the system of justice, that in a case in which there was a great deal of evidence leading towards conviction, the State would have chosen to suppress evidence favorable to the defense rather than to take action consistent with a real belief in the rule of law and a fair trial for every defendant. This defendant should have been tried fairly. There is no reason why the State could not have tried him fairly at that time, nor is there any reason why they could not try him fairly today.
The issue is governmental misconduct. The courts cannot allow the government to try a citizen in the courts while knowingly and purposely weighting that trial against the citizen by the deliberate suppression of favorable evidence. This nation has seen that principle played out in the newspapers and the television sets of America in the *37 case of United States v. Russo, Case No. ____, D.Calif., May 11, 1973. The consequences of a reversal and the granting of new trial to this Defendant may seem insignificant. However, the consequences to our nation and to this state of allowing any single instance of governmental misconduct to go without rebuke, are too dire for us ever again to say that this single instance should somehow be covered up. For these reasons I must dissent and would reverse the conviction and grant a new trial.
Finally, I must apologize for the sad, but perhaps inevitable, fact that the first opinion written by a female jurist on this court should be in dissent. While respecting the wisdom and experience of my brothers on the bench, as reflected in the majority opinion, I cannot but feel that the consequences of such abuses of governmental power as those illustrated in the State's suppression of evidence herein are of such deep concern to us all, morally and legally, as to necessitate this dissent.
CARLTON, C.J., and ERVIN, J., concur.
NOTES
[1] Fiswick v. United States, 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed.2d 196 (1946); Clune v. United States, 159 U.S. 590, 16 S.Ct. 125, 40 L.Ed. 269 (1895); Honchell v. State, 257 So.2d 889 (Fla. 1971); Mercer v. State, 40 Fla. 216, 24 So. 154 (1898); Roberson v. State, 40 Fla. 509, 24 So. 474 (1898); Farnell v. State, 214 So.2d 753 (Fla.App.2d 1968).
[2] Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949); Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Rogers v. United States, 334 F.2d 83 (5th Cir.1964), cert. denied, Levine v. United States, 380 U.S. 915, 85 S.Ct. 892, 13 L.Ed.2d 800 (1965); Carbo v. United States, 314 F.2d 718 (9th Cir.1963); United States v. Consolidated Laundries Corp., 291 F.2d 563 (2d Cir.1961); Ong Way Jong v. United States, 245 F.2d 392 (9th Cir.1957); Montford v. United States, 200 F.2d 759 (5th Cir.1952); Minner v. United States, 57 F.2d 506 (10th Cir.1932); Honchell v. State, 257 So.2d 889 (Fla. 1971); Farnell v. State, 214 So.2d 753 (Fla.App.2d 1968).
[3] See, e.g., Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957); Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947); Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Direct Sales Co. v. United States, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943); United States v. Manton, 107 F.2d 834 (2d Cir.1938), cert. denied, 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940).
[4] Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); United States v. Keogh, 391 F.2d 138 (2d Cir.1968).
[1] Looking briefly at some of the kinds of suppressed evidence that the Courts have felt were "useful" to the defense to an extent that a new trial was necessitated by its suppression, highlights the importance of the suppressed statement in this case. E.g., United States ex rel. Almeida v. Baldi, 195 F.2d 815 (3d Cir.1952). (In a first degree murder case in which the defendant was given death, the prosecution did not reveal that a bullet found at the scene of the murder showed that the defendant was not the actual killer. Since it had been a felony murder case, the prosecution felt there was no relevance to the guilt or innocence of the defendant. Nonetheless, the Court held that this information might have mitigated the death penalty to a life term, and a new trial was granted.); Jackson v. Wainwright, 390 F.2d 288 (5th Cir.1968) (Brought before the federal courts in a habeas corpus action, a rape defendant who had been given the death penalty argued that the suppressed statement of one of the witnesses that the man she had seen running away from the victim had a much lighter complexion than the defendant was held to be grounds for a new trial.); Ashley v. Texas, 319 F.2d 80 (5th Cir.1963) (In this first degree murder case, the defendant was given a death penalty. All appeals were exhausted. Habeas corpus in the Federal District Court was denied, and appeal was taken to the Fifth Circuit. Suppressed evidence involved in the habeas were two psychiatric reports stating that the defendant was insane. The State introduced at time of trial, a single psychiatric report that stated that the defendant was sane. The State made no mention of the other two reports. A new trial was granted.); United States ex rel. Thompson v. Dye, 221 F.2d 763 (3d Cir.1955) (In this first degree murder trial in which the defendant was given the death penalty, the defendant had contended that he was entirely too drunk to form the necessary premeditation for first degree murder. One arresting officer out of four had made a preliminary statement to the prosecution that four hours after the murder, the defendant appeared to be drunk. That officer was not used at time of trial, and the other three were. The case was reversed and a new trial was granted.); Curran v. Delaware, 154 F. Supp. 27 (Del.D. 1957) (In a 1948 rape case, all three accused men were given life sentences. The major witness against them was a detective who testified that each man had only signed one statement. Each of the defendants testified that they had signed two statements. Eight years later, it developed that there had indeed been two statements, and the original had been destroyed by the detective. "In the first place, by suppressing the facts surrounding the `original' set of statements, defense counsel was deprived of the ability to make such use of this set of statements as might have been in the interest of the petitioner." Reversed.); United States v. Ragen, 86 F. Supp. 382 (N.D.Ill. 1949) (A 1924 rape defendant, who had been given a life sentence complained of suppressed evidence which would have shown that the doctor who examined the victim of the rape would have testified that there was no evidence that she had been raped. Because the defendant was totally unaware of the doctor's statement, the Court found that the State had a duty to call the doctor as a witness instead of suppressing his testimony. If the State was not going to make use of the doctor's testimony, it had an obligation and duty to make that testimony available to the defense prior to trial.); United States ex rel. Butler v. Maroney, 319 F.2d 622 (3d Cir.1963) (The defendant had originally been accused and convicted of robbery, and given a four to ten-year sentence. He was on his way to jail in a car with the sheriff and another individual when he seized a gun and shot the sheriff. He was given the death penalty after being convicted of first degree murder. The statement was never offered into evidence by the driver of the car to the officers investigating the matter to the effect that after the gun had been seized, a struggle ensued between the sheriff and Butler. The case was reversed and a new trial was granted on the grounds that it was quite possible that had the statement been available, it could have been employed in some manner for a lesser offense verdict.)